69 Cal.2d 200 (1968)
Estate of THELMA L. RUSSELL, Deceased. GEORGIA NAN RUSSELL HEMBREE, Plaintiff and Appellant,
v.
CHESTER H. QUINN, Defendant and Respondent.
L. A. No. 29418. 
Supreme Court of California. In Bank. 
Aug. 19, 1968.
 Higgs, Jennings, Fletcher & Mack, Vincent E. Whelan, Gerald J. O'Neill, Joel C. Estes and Donald R. Lincoln for Plaintiff and Appellant.
 McInnis, Focht & Fitzgerald and James L. Focht for Defendant and Respondent.
 SULLIVAN, J.
 Georgia Nan Russell Hembree appeals from a judgment (Prob. Code, 1240 [fn. 1]) entered in proceedings for the determination of heirship ( 1080-1082) decreeing inter alia that under the terms of the will of Thelma L. Russell, deceased, all of the residue of her estate should be distributed to Chester H. Quinn.
 Thelma L. Russell died testate on September 8, 1965, leaving a validly executed holographic will written on a small card. The front of the card reads: *203
 "Turn the card"
 March 18-1957
 I leave everything
 I own Real &
 Personal to Chester
 H. Quinn & Roxy Russell
 Thelma L. Russell""
 THE REVERSE SIDE READS:
 My ($10.) Ten dollar gold
 Piece & diamonds I leave
 to Georgia Nan Russell.
 Alverata, Geogia [sic].""
 Chester H. Quinn was a close friend and companion of testatrix, who for over 25 years prior to her death had resided in one of the living units on her property and had stood in a relation of personal trust and confidence toward her. Roxy Russell was testatrix' pet dog which was alive on the date of the execution of testatrix' will but predeceased her. [fn. 2]plaintiff is testatrix' niece and her only heir-at-law.
 In her petition for determination of heirship plaintiff alleges, inter alia, that "Roxy Russell is an Airedale dog"; [fn. 3] that section 27 enumerates those entitled to take by will; that "Dogs are not included among those listed in ... Section 27. Not even Airedale dogs"; that the gift of one-half of the residue of testatrix' estate to Roxy Russell is invalid and void; and that plaintiff was entitled to such one-half as testatrix' sole heir-at-law.
 At the hearing on the petition, plaintiff introduced without objection extrinsic evidence establishing that Roxy Russell was testatrix' Airedale dog which died on June 9, 1958. To this end plaintiff, in addition to an independent witness, called defendant pursuant to former Code of Civil Procedure *204 section 2055 (now Evid. Code, 776). Upon redirect examination, counsel for Quinn then sought to introduce evidence of the latter's relationship with testatrix "in the event that your Honor feels that there is any necessity for further ascertainment of the intent above and beyond the document."plaintiff's objections on the ground that it was inadmissible under the statute of wills and the parole evidence rule "because there is no ambiguity" and that it was inadmissible under section 105, were overruled. Over plaintiff's objection, counsel for Quinn also introduced certain documentary evidence consisting of testatrix' address book and a certain quitclaim deed "for the purpose of demonstrating the intention on the part of the deceased that she not die intestate." Of all this extrinsic evidence only the following infinitesimal portion of Quinn's testimony relates to care of the dog: "Q. [Counsel for Quinn] Prior to the first Roxy's death did you ever discuss with Miss Russell taking care of Roxy if anything should ever happen to her? A. Yes."plaintiff carefully preserved an objection running to all of the above line of testimony and at the conclusion of the hearing moved to strike such evidence. Her motion was denied.
 The trial court found, so far as is here material, that it was the intention of the testatrix "that Chester H. Quinn was to receive her entire estate, excepting the gold coin and diamonds bequeathed to" plaintiff and that Quinn "was to care for the dog, Roxy Russell, in the event of Testatrix's death. The language contained in the Will concerning the dog, Roxy Russell, was precatory in nature only, and merely indicative of the wish, desire and concern of Testatrix that Chester H. Quinn was to care for the dog, Roxy Russell, subsequent to Testatrix's death." [fn. 4] The court concluded that testatrix *205 intended to and did make an absolute and outright gift to Mr. Quinn of all the residue of her estate, adding: "There occurred no lapse as to any portion of the residuary gift to Chester H. Quinn by reason of the language contained in the Will concerning the dog, Roxy Russell, such language not having the effect of being an attempted outright gift or gift in trust to the dog. The effect of such language is merely to indicate the intention of Testatrix that Chester H. Quinn was to take the entire residuary estate and to use whatever portion thereof as might be necessary to care for and maintain the dog, Roxy Russell." Judgment was entered accordingly. This appeal followed.
 Plaintiff's position before us may be summarized thusly: That the gift of one-half of the residue of the estate to testatrix' dog was clear and unambiguous; that such gift was void and the property subject thereof passed to plaintiff under the laws of intestate succession; and that the court erred in admitting the extrinsic evidence offered by Quinn but that in any event the uncontradicted evidence in the record did not cure the invalidity of the gift.
 We proceed to set forth the rules here applicable which govern the interpretation of wills.
 [1a] First, as we have said many times: "The paramount rule in the construction of wills, to which all other rules must yield, is that a will is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible." (Estate of Wilson (1920) 184 Cal. 63, 66-67 [193 P. 581].) [fn. 5] The rule is imbedded *206 in the Probate Code. ( 101.) [fn. 6] Its objective is to ascertain what the testator meant by the language he used. [fn. 7]
 [2a] When the language of a will is ambiguous or uncertain resort may be had to extrinsic evidence in order to ascertain the intention of the testator. [fn. 8] We have said that extrinsic evidence is admissible "to explain any ambiguity arising on the face of a will, or to resolve a latent ambiguity which does not so appear." (Estate of Torregano (1960) 54 Cal.2d 234, *207 246 [5 Cal.Rptr. 137, 352 P.2d 505, 88 A.L.R.2d 597], citing 105.) [fn. 9] [3a] A latent ambiguity is one which is not apparent on the face of the will but is disclosed by some fact collateral to it. (See 4 Page on Wills (Bowe- Parker Rev.) 32.7, p. 255; Comment: Extrinsic Evidence and the Construction of Wills in California (1962) 50 Cal.L.Rev. 283, 284-291.)
 As to latent ambiguities, this court in the Donnellan case said: "Broadly speaking, there are two classes of wills presenting latent ambiguities, for the removal of which ambiguities resort to extrinsic evidence is permissible. The one class is where there are two or more persons or things exactly measuring up to the description and conditions of the will, ... The other class is where no person or thing exactly answers the declarations and descriptions of the will, but where two or more persons or things in part though imperfectly do so answer." (Estate of Donnellan (1912) 164 Cal. 14, 20 [127 P. 166].) [fn. 10] Extrinsic evidence always may be introduced initially in order to show that under the circumstances of a particular case the seemingly clear language of a will describing either the subject of or the object of the gift actually embodies a latent ambiguity for it is only by the introduction of extrinsic evidence that the existence of such an ambiguity can be shown. Once shown, such ambiguity may be resolved by extrinsic evidence. (Estate of Dominici (1907) 151 Cal. 181, 184 [90 P. 448]; Taylor v. McCowen (1908) 154 Cal. 798, 802 [99 P. 351]; Estate of Donnellan, supra, 164 Cal. 14, 20, 22-24; cf. Estate of Sargavak (1953) 41 Cal.2d 314, 320 [259 P.2d 897]; Estate of Carter (1956) 47 Cal.2d 200, 207-208 [302 P.2d 301].)
 [2b] A patent ambiguity is an uncertainty which appears on the face of the will. (Estate of Womersley (1912) 164 Cal. 85, 87 [127 P. 645]; Estate of Willson (1915) 171 Cal. 449, 456-457 [153 P. 927]; Estate of Salmonski (1951) 38 Cal.2d *208 199, 214 [238 P.2d 966]; see generally 4 Page on Wills, op.cit. supra, 32.7, p. 255; Comment: supra, 50 Cal.L.Rev. 283, 284-291.) "When an uncertainty arises upon the face of a will as to the meaning of any of its provisions, the testator's intent is to be ascertained from the words of the will, but the circumstances of the execution thereof may be taken into consideration, excluding the oral declarations of the testator as to his intentions." (Estate of Salmonski, supra, 38 Cal.2d 199, 214.) [fn. 11] This is but a corollary derived from an older formalism. Long before Salmonski it was said in Estate of Willson, supra, 171 Cal. 449, 456: "The rule is well established that where the meaning of the will, on its face, taking the words in the ordinary sense, is entirely clear, and where no latent ambiguity is made to appear by extrinsic evidence, there can be no evidence of extrinsic circumstances to show that the testatrix intended or desired to do something not expressed in the will." [fn. 12] However, this ancient touchstone has not necessarily uncovered judicial material of unquestioned purity.
 In order to determine initially whether the terms of any written instrument are clear, definite and free from ambiguity the court must examine the instrument in the light of the *209 circumstances surroundings its execution so as to ascertain what the parties meant by the words used. Only then can it be determined whether the seemingly clear language of the instrument is in fact ambiguous. "Words are used in an endless variety of contexts. Their meaning is not subsequently attached to them by the reader but is formulated by the writer and can only be found by interpretation in the light of all the circumstances that reveal the sense in which the writer used the words. The exclusion of parol evidence regarding such circumstances merely because the words do not appear ambiguous to the reader can easily lead to the attribution to a written instrument of a meaning that was never intended." (Universal Sales Corp. v. California etc. Mfg. Co. (1942) 20 Cal.2d 751, 776 [128 P.2d 665] (Traynor, J., concurring).) [4] "The court must determine the true meaning of the instrument in the light of the evidence available. It can neither exclude extrinsic evidence relevant to that determination nor invoke such evidence to write a new or different instrument." (Laux v. Freed (1960) 53 Cal.2d 512, 527 [2 Cal.Rptr. 265, 348 P.2d 873] (Traynor, J., concurring); see also Corbin, The Interpretation of Words and the Parol Evidence Rule (1965) 50 Cornell L.Q. 161, 164: "[W]hen a judge refuses to consider relevant extrinsic evidence on the ground that the meaning of written words is to him plain and clear, his decision is formed by and wholly based upon the completely extrinsic evidence of his own personal education and experience"; Corbin, op.cit. supra, pp. 189-190; Farnsworth, "Meaning" in the Law of Contracts (1967) 76 Yale L.J. 939, 957-965; Holmes, The Theory of Legal Interpretation (1899) 12 Harv.L.Rev. 417, 420; Rest., Contracts, 230, coms. a, b, 235, cls. (a), (d), coms. a, f, 238, cl. (a), com. a, 242, com. a; 3 Corbin on Contracts (1960) 535, pp. 17-21, 536, pp. 27-30 et seq.; 4 Page on Wills, op.cit. supra, 30.8, p. 59, 32.1, pp. 232-233, 32.2 pp. 236-237; 9 Wigmore on Evidence (3d ed. 1940) 2470 et seq.; 4 Williston on Contracts (3d ed. 1961) 610, pp. 499-503; 610A, pp. 517-519, 629, pp. 923-925; Witkin, Cal. Evidence (2d ed. 1966) 730, p. 675 et seq.)
 The foregoing reflects the modern development of rules governing interpretation, for in the words of Wigmore "The history of the law of Interpretation is the history of a progress from a stiff and superstitious formalism to a flexible rationalism." (9 Wigmore, op.cit. supra, 2461, p. 187.) While "still surviving to us, in many Courts, from the old formalism ... [is] the rule that you cannot disturb a plain *210 meaning" (9 Wigmore, op.cit. supra, p. 191, original emphasis) nevertheless decisions and authorities like those cited above bespeak the current tendency to abandon the "stiff formalism of earlier interpretation" and to show the meaning of words even though no ambiguity appears on the face of the document.
 There is nothing in these rules of interpretation which confines their application to contracts. Indeed quite the contrary. The rules are a response to "problems which run through all the varieties of jural acts," are therefore not necessarily solvable separately for deeds, contracts and wills, are not peculiar to any one kind of jural act, but involve a general principle applicable to all. (9 Wigmore, op.cit. supra, 2401, pp. 6-7, 2458, pp. 179-181, 2463, 2467.) Thus Wigmore says: "In the field of wills, where there is none but the individual standard [fn. [13]] of meaning to be considered, this principle is seen in unrestricted operation; ..." [fn. 14] ( 2470, p. 228.)
 Accordingly, we think it is self-evident that in the interpretation of a will, a court cannot determine whether the terms of the will are clear and definite in the first place until it considers the circumstances under which the will was made so that the judge may be placed in the position of the testator whose language he is interpreting. (Cf. Code Civ. Proc., *211 1860.) [fn. 15] Failure to enter upon such an inquiry is failure to recognize that the "ordinary standard or 'plain meaning,' is simply the meaning of the people who did not write the document." (9 Wigmore, op.cit. supra, 2462, p. 191.)
 Thus we have declared in a slightly different context that extrinsic evidence as to the circumstances under which a written instrument was made is " 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' (Coast Bank v. Minderhout, 61 Cal.2d 311, 315 [38 Cal.Rptr. 505, 392 P.2d 265]; ...), and it is the instrument itself that must be given effect. (Civ. Code, 1638, 1639; Code Civ. Proc., 1856.)" (Parsons v. Bristol Dev. Co. (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) [fn. 16] "If the evidence offered would not persuade a reasonable man that the instrument meant anything other than the ordinary meaning of its words, it is useless." (Estate of Rule (1944) 25 Cal.2d 1, 22 [152 P.2d 1003, 155 A.L.R. 1319] (Traynor, J., dissenting), disapproved on other grounds, Parsons v. Bristol Dev. Co., supra, 62 Cal.2d 861, 866, fn. 2.) [fn. 17] [3b] On the other hand an ambiguity is said to exist when, in the light of the circumstances surrounding the execution of an instrument, "the written language is fairly susceptible of two or more constructions." (Hulse v. Juillard Fancy Foods Co. (1964) 61 Cal.2d 571, 573 [39 Cal.Rptr. 529, 394 P.2d 65]; Nofziger v. Holman (1964) 61 Cal.2d *212 526, 528 [39 Cal.Rptr. 384, 393 P.2d 696]; Coast Bank v. Minderhout (1964) 61 Cal.2d 311, 315 [38 Cal.Rptr. 505, 392 P.2d 265], citing cases; see Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co., ante, p. 40.)
 As we have explained, what is here involved is a general principle of interpretation of written instruments, applicable to wills as well as to deeds and contracts. Even when the answer to the problem of interpretation is different for different kinds of written instruments, "it appears in all cases as a variation from some general doctrine." (9 Wigmore, op.cit. supra, 2401, p. 7.) Under the application of this general principle in the field of wills, extrinsic evidence of the circumstances under which a will is made (except evidence expressly excluded by statute) [fn. 18] may be considered by the court in ascertaining what the testator meant by the words used in the will. If in the light of such extrinsic evidence, the provisions of the will are reasonably susceptible of two or more meanings claimed to have been intended by the testator, "an uncertainty arises upon the face of a will" ( 105) and extrinsic evidence relevant to prove any of such meanings is admissible (see 106), [fn. 19] subject to the restrictions imposed by statute ( 105). [5a] If, on the other hand, in the light of such extrinsic evidence, the provisions of the will are not reasonably susceptible of two or more meanings, there is no uncertainty arising upon the face of the will ( 105; see Estate of Beldon (1938) 11 Cal.2d 108, 117 [77 P.2d 1052]; Estate of Pierce (1948) 32 Cal.2d 265, 272 [196 P.2d 1]; Estate of Carter, supra, 47 Cal.2d 200, 207) and any proffered evidence attempting to show an intention different from that expressed by the words therein, giving them the only meaning to which they are reasonably susceptible, is inadmissible. In the latter case the provisions of the will are to be interpreted according to such meaning. In short, we hold that while section 105 delineates the manner of ascertaining the testator's *213 intention "when an uncertainty arises upon the face of a will," it cannot always be determined whether the will is ambiguous or not until the surrounding circumstances are first considered.
 [1b] Finally, before taking up testatrix' will, we add a brief word concerning our proper function on this appeal. This function must subserve the paramount rule that the "will is to be construed according to the intention of the testator." (See fns. 5 and 6, ante, and accompanying text.) [6] As we said in Parsons v. Bristol Dev. Co., supra, 62 Cal.2d 861, 865, it is "solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." (See fn. 8, ante.) Accordingly, "an appellate court is not bound by a construction of a document based solely upon the terms of the written instrument without the aid of extrinsic evidence, where there is no conflict in the evidence, or a determination has been made upon incompetent evidence. [Citations.]" (Estate of Wunderle (1947) 30 Cal.2d 274, 280 [181 P.2d 874]; see Estate of Donnellan, supra, 164 Cal. 14, 19; Estate of Platt (1942) 21 Cal.2d 343, 352 [131 P.2d 825]; Parsons v. Bristol Dev. Co., supra, 62 Cal.2d 861, 865.)
 We said in Estate of Beldon, supra, 11 Cal.2d 108, 111-112, " 'The making of a will raises a presumption that the testator intended to dispose of all his property. Residuary clauses are generally inserted for the purpose of making that disposition complete, and these clauses are always to receive a broad and liberal interpretation, with a view of preventing intestacy as to any portion of the estate of the testator, and this general rule is in harmony with the declaration of our code that the provisions of a will must be construed, if possible, so as to effect that purpose.' (O'Connor v. Murphy, 147 Cal. 148, 153 [81 P. 406].) But there is no room for application of the rule if the testator's language, taken in the light of surrounding circumstances, will not reasonably admit of more than one construction. ... If [testator] used language which results in intestacy, and there can be no doubt about the meaning of the language which was used, the court must hold that intestacy was intended." [5b] Therefore, if having ascertained in the instant case that the provisions of the will are not reasonably susceptible of two or more meanings, we conclude that the only meaning to which the words expressed by testatrix are reasonably susceptible results in intestacy, we must give effect to her will accordingly. (Estate of Beldon, supra, *214 11 Cal.2d 108, 112; Estate of Akeley (1950) 35 Cal.2d 26, 32 [215 P.2d 921, 17 A.L.R.2d 647] (Traynor, J. dissenting); Estate of Barnes (1965) 63 Cal.2d 580, 583-584 [47 Cal.Rptr. 480, 407 P.2d 656].)
 [7a] Examining testatrix' will in the light of the foregoing rules, we arrive at the following conclusions: Extrinsic evidence offered by plaintiff was admitted without objection and indeed would have been properly admitted over objection to raise and resolve the latent ambiguity as to Roxy Russell and ultimately to establish that Roxy Russell was a dog. Extrinsic evidence of the surrounding circumstances [fn. 20] was properly considered in order to ascertain what testatrix meant by the words of the will, including the words: "I leave everything I own Real & Personal to Chester H. Quinn & Roxy Russell" or as those words can now be read "to Chester H. Quinn and my dog Roxy Russell."
 However, viewing the will in the light of the surrounding circumstances as are disclosed by the record, we conclude that the will cannot reasonably be construed as urged by Quinn and determined by the trial court as providing that testatrix intended to make an absolute and outright gift of the entire residue of her estate to Quinn who was "to use whatever portion thereof as might be necessary to care for and maintain the dog." No words of the will gave the entire residuum to Quinn, much less indicate that the provision for the dog is merely precatory in nature. Such an interpretation is not consistent with a disposition which by its language leaves the residuum in equal shares to Quinn and the dog. A disposition in equal shares to two beneficiaries cannot be equated with a disposition of the whole to one of them who may use "whatever portion thereof as might be necessary" on behalf of the other. (See 104; cf. Estate of Kearns (1950) 36 Cal.2d 531, 534-536 [225 P.2d 218].) [8] Neither can the bare language of a gift of one-half of the residue to the dog be so expanded as to mean a gift to Quinn in trust for the care of the dog, there being no words indicating an enforceable duty upon Quinn to do so or indicating to whom the trust property is to go upon termination of the trust. "While no particular form of expression is necessary for the creation of a trust, nevertheless some expression of intent to that end is requisite." (Estate of Doane, supra, 190 Cal. 412, 415; see 104; *215 Estate of Marti (1901) 132 Cal. 666, 669 [61 P. 964, 64 P. 1071]; Estate of McCray (1928) 204 Cal. 399, 402 [268 P. 647]; Estate of Sargavak, supra, 41 Cal.2d 314, 319, citing cases.)
 [7b] Accordingly, since in the light of the extrinsic evidence introduced below, the terms of the will are not reasonably susceptible of the meaning claimed by Quinn to have been intended by testatrix, the extrinsic evidence offered to show such an intention should have been excluded by the trial court. [fn. 21] Upon an independent examination of the will we conclude that the trial court's interpretation of the terms thereof was erroneous. Interpreting the provisions relating to testatrix' residuary estate in accordance with the only meaning to which they are reasonably susceptible, we conclude that testatrix intended to make a disposition of all of the residue of the estate to Quinn and the dog in equal shares; therefore, as tenants in common. ( 29; Estate of Hittell (1903) 141 Cal. 432, 434-436 [75 P. 53]; Estate of Murphy (1909) 157 Cal. 63, 66-72 [106 P. 230, 137 Am.St.Rep. 110]; Estate of Kunkler (1912) 163 Cal. 797, 800 [127 P. 43]; Noble v. Beach (1942) 21 Cal.2d 91, 94 [130 P.2d 426].) As a dog cannot be the beneficiary under a will ( 27; see 1 Page on Wills, op.cit. supra, 17.21, p. 851) the attempted gift to Roxy Russell is void. [fn. 22] ( 27; Estate of Burnison (1949) 33 Cal.2d 638, 646 [204 P.2d 330], affd. 339 U.S. 87 [94 L.Ed. 675, 70 S.Ct. 503]; Estate of Doane, supra, 190 Cal. 412.)
 There remains only the necessity of determining the effect of the void gift to the dog upon the disposition of the residuary estate. [9] That portion of any residuary estate that is the subject of a lapsed gift to one of the residuary beneficiaries remains undisposed of by the will and passes to the heirs-at-law. ( 92, 220; Estate of Hittell, supra, 141 Cal. *216 432, 437; Estate of Kunkler, supra, 163 Cal. 797, 800; Estate of Hall (1920) 183 Cal. 61, 63 [190 P. 364].) The rule is equally applicable with respect to a void gift to one of the residuary beneficiaries. ( 220; see 96 C.J.S., Wills, 1226; 53 Cal.Jur.2d, Wills, 271, p. 531.) [7c] Therefore, notwithstanding testatrix' expressed intention to limit the extent of her gift by will to plaintiff (see Estate of Barnes, supra, 63 Cal.2d 580, 583) one-half of the residuary estate passes to plaintiff as testatrix' only heir-at-law ( 225). We conclude that the residue of testatrix' estate should be distributed in equal shares to Chester H. Quinn and Georgia Nan Russell Hembree, testatrix' niece.
 The judgment is reversed and the cause is remanded with directions to the trial court to set aside the findings of fact and conclusions of law; to make and file findings of fact and conclusions of law in conformity with the views herein expressed; and to enter judgment accordingly. Such findings of fact, conclusions of law and judgment shall be prepared, signed, filed and entered in the manner provided by law.plaintiff shall recover costs on appeal.
 Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.
 McCOMB, J.
 I dissent. I would affirm the judgment for the reasons expressed by Mr. Presiding Justice Brown in the opinion prepared by him for the Court of Appeal, Fourth Appellate District, Division One (Estate of Russell, 4 Civ. 8740, filed October 16, 1967, certified for non- publication).
 The trial court found further: "Testatrix intended that Georgia Nan Russell Hembree was not to have any other real or personal property belonging to Testatrix, other than the gold coin and diamonds." This finding also was elaborated on in the memorandum decision: "In making the will it is apparent she had Georgia on her mind. While there is other evidence in the case about Thelma Russell's frame of mind concerning her real property and her niece, which was admitted by the Court, over counsel's vigorous objection, because it concerned testatrix' frame of mind, a condition relevant to the material issue of intent, nevertheless this additional evidence was not necessary to this Court in reaching its conclusion." The additional evidence, referred to included an address book of testatrix upon which she had written: "Chester, Don't let Augusta and Georgia have one penny of my place if it takes it all to fight it in Court. Thelma."
NOTES
[fn. 1] 1. Hereafter unless otherwise indicated all section references are to the Probate Code.
[fn. 2] 2. Actually the record indicates the existence of two Roxy Russells. The original Roxy was an Airedale dog which testatrix owned at the time she made her will, but which, according to Quinn, died after having had a fox tail removed from its nose, and which, according to the testimony of one Arthur Turner, owner of a pet cemetery, was buried on June 9, 1958. Roxy was replaced with another dog (breed not indicated in the record before us) which, although it answered to the name Roxy, was, according to the record, in fact registered with the American Kennel Club as "Russel's [sic] Royal Kick Roxy."
[fn. 3] 3. In his "Petition for Probate of Holographic Will and for Letters of Administration with the Will Annexed," Quinn included under the names, ages and residences of the devisees and legatees of testatrix ( 326, subd. (3)) the following: "Roxy Russell, A 9 year old Airedale dog, [residing at] 4422 Palm Avenue, La Mesa, Calif."
[fn. 4] 4. The memorandum decision elaborates on this point, stating in part: "The obvious concern of the human who loves her pet is to see that it is properly cared for by someone who may be trusted to honor that concern and through resources the person may make available in the will to carry out this entreaty, desire, wish, recommendation or prayer. This, in other words, is a most logical example of a precatory provision. It is the only logical conclusion one can come to which would not do violence to the apparent intent of Mrs. Russell."
[fn. 5] 5. Accord: Welch v. Huse (1875) 49 Cal. 506, 509; In re Stratton (1896) 112 Cal. 513, 518 [44 P. 1028]; Estate of Marti (1901) 132 Cal. 666, 668-669 [61 P. 964, 64 P. 1071]; Estate of Lakemeyer (1901) 135 Cal. 28, 29 [66 P. 961, 87 Am.St.Rep. 96]; Kauffman v. Gries (1903) 141 Cal. 295, 299 [74 P. 846]; Estate of Dominici (1907) 151 Cal. 181, 184, 185 [90 P. 448]; Estate of Blake (1910) 157 Cal. 448, 458-459 [108 P. 287]; Estate of Henderson (1911) 161 Cal. 353, 357 [119 P. 496]; Estate of Spreckels (1912) 162 Cal. 559, 567 [123 P. 371]; Estate of Sessions (1915) 171 Cal. 346, 349 [153 P. 231]; Estate of Hoytema (1919) 180 Cal. 430, 432 [181 P. 645]; Estate of Ritzman (1921) 186 Cal. 567, 568-569 [199 P. 783]; Estate of McCurdy (1925) 197 Cal. 276, 282 [240 P. 498]; Estate of Hartson (1933) 218 Cal. 536, 539 [24 P.2d 171]; Estate of Lawrence (1941) 17 Cal.2d 1, 6 [108 P.2d 893]; Estate of Akeley (1950) 35 Cal.2d 26, 28 [215 P.2d 921, 17 A.L.R.2d 647]; Estate of Kearns (1950) 36 Cal.2d 531, 535 [225 P.2d 218]; Estate of Salmonski (1951) 38 Cal.2d 199, 209 [238 P.2d 966]; Estate of Lefranc (1952) 38 Cal.2d 289, 295- 296 [239 P.2d 617]; Estate of Resler (1954) 43 Cal.2d 726, 732 [278 P.2d 1]; Estate of Johnston (1956) 47 Cal.2d 265, 269 [303 P.2d 1]; Estate of Thompson (1958) 50 Cal.2d 613, 617 [328 P.2d 1]; Estate of Jones (1961) 55 Cal.2d 531, 536, 538 [11 Cal.Rptr. 574, 360 P.2d 70], disapproved on other grounds, Parsons v. Bristol Dev. Co. (1965) 62 Cal.2d 861, 866, fn. 2 [44 Cal.Rptr. 767, 402 P.2d 839]; Estate of Karkeet (1961) 56 Cal.2d 277, 281 [14 Cal.Rptr. 664, 363 P.2d 896]; Estate of Barnes (1965) 63 Cal.2d 580, 583 [47 Cal.Rptr. 480, 407 P.2d 656].
[fn. 6] 6. Section 101 in pertinent part provides: "A will is to be construed according to the intention of the testator. Where his intention cannot have effect to its full extent, it must have effect as far as possible."
[fn. 7] 7. Section 163; Estate of Young (1899) 123 Cal. 337, 341-345 [55 P. 1011]; Estate of Tompkins (1901) 132 Cal. 173, 176 [64 P. 268]; Estate of Fair (1901) 132 Cal. 523, 530 [60 P. 442, 64 P. 1000, 84 Am.St.Rep. 70]; Estate of Dominici (1907) 151 Cal. 181, 185 [90 P. 448]; Estate of Blake (1910) 157 Cal. 448, 459 [108 P. 287]; Estate of Henderson (1911) 161 Cal. 353, 357 [119 P. 496]; Estate of Spreckels (1912) 162 Cal. 559, 567 [123 P. 371]; Estate of Donnellan (1912) 164 Cal. 14, 19-20 [127 P. 166]; Estate of Sessions (1915) 171 Cal. 346, 349 [153 P. 231]; Estate of Hoytema (1919) 180 Cal. 430, 432 [181 P. 645]; Estate of Phelps (1920) 182 Cal. 752, 756 [190 P. 17]; Estate of Wilson, supra, 184 Cal. 63, 66-67; Estate of Ritzman (1921) 186 Cal. 567, 569 [199 P. 783]; Estate of Metcalfe (1926) 199 Cal. 716, 720 [251 P. 202]; Estate of McCray (1928) 204 Cal. 399, 402 [268 P. 647]; Estate of Layton (1933) 217 Cal. 451, 458 [19 P.2d 793, 91 A.L.R. 480]; Estate of Beldon (1938) 11 Cal.2d 108, 112 [77 P.2d 1052]; Estate of Northcutt (1940) 16 Cal.2d 683, 688, 689 [107 P.2d 607]; Estate of Axcelrod (1944) 23 Cal.2d 761, 766 [147 P.2d 1]; Estate of Brunet (1949) 34 Cal.2d 105, 107, 108 [207 P.2d 567, 11 A.L.R.2d 1382]; Estate of Lefranc (1952) 38 Cal.2d 289, 298 [239 P.2d 617]; Estate of Resler (1954) 43 Cal.2d 726, 732 [278 P.2d 1].
[fn. 8] 8. "It is a fundamental and indisputable proposition that wherever doubt arises as to the meaning of a will, such doubt is resolved by construction and that construction is one of law,--it is an application of legal rules governing construction either to the will alone or to properly admitted facts to explain what the testator meant by the doubtful language. In those cases where extrinsic evidence is permissible there may be a conflict in the extrinsic evidence itself, in which case the determination of that conflict results in a finding of pure fact. But when the facts are thus found, those facts do not solve the difficulty. They still are to be applied to the written directions of the will for the latter's construction, and that construction still remains a construction at law." (Estate of Donnellan (1912) 164 Cal. 14, 19 [127 P. 166], per Henshaw, J.; accord: Estate of Platt (1942) 21 Cal.2d 343, 352 [131 P.2d 825]; see Parsons v. Bristol Dev. Co. (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)
[fn. 9] 9. Section 105 provides: "When there is an imperfect description, or no person or property exactly answers the description, mistakes and omissions must be corrected, if the error appears from the context of the will or from extrinsic evidence, excluding the oral declarations of the testator as to his intentions; and when an uncertainty arises upon the face of a will, as to the application of any of its provisions, the testator's intention is to be ascertained from the words of the will, taking into view the circumstances under which it was made, excluding such oral declarations."
[fn. 10] 10. Section 105; accord: Estate of Dominici (1907) 151 Cal. 181, 184 [90 P. 448]; Taylor v. McCowen (1908) 154 Cal. 798, 802 [99 P. 351]; Estate of Donnellan, supra, 164 Cal. 14, 19-21; Estate of Sargavak (1953) 41 Cal.2d 314, 319-321 [259 P.2d 897]; Estate of Carter (1956) 47 Cal.2d 200, 207-208 [302 P.2d 301].
[fn. 11] 11. Section 105; accord: In re Hayedenfeldt (1895) 106 Cal. 434, 438-440 [39 P. 788]; In re Stratton (1896) 112 Cal. 513, 518 [44 P. 1028]; Estate of Young (1899) 123 Cal. 337 342 [55 P. 1011]; Estate of Langdon (1900) 129 Cal. 451, 453-454 [62 P. 73]; Taylor v. McCowen, supra, 154 Cal. 798, 801-802; Estate of Murphy (1909) 157 Cal. 63, 69 [106 P. 230, 137 Am.St.Rep. 110]; Estate of Carothers (1911) 161 Cal. 588, 591 [119 P. 926]; Estate of Sessions (1915) 171 Cal. 346, 349 [153 P. 231]; Estate of Hoytema (1919) 180 Cal. 430, 432 [181 P. 645]; Estate of Phelps (1920) 182 Cal. 752, 756 [190 P. 17]; Estate of Carrillo (1921) 187 Cal. 597, 602 [203 P. 104]; Estate of Kurtz (1922) 190 Cal. 146, 149 [210 P. 959], explained on other grounds, Estate of Duke (1953) 41 Cal.2d 509, 515 [261 P.2d 235]; Estate of Kelleher (1927) 202 Cal. 124, 127-128 [259 P. 437, 54 A.L.R. 913]; Estate of Pierce (1948) 32 Cal.2d 265, 272-274 [196 P.2d 1]; Estate of Kearns (1950) 36 Cal.2d 531, 537 [225 P.2d 218]; Estate of Sargavak, supra, 41 Cal.2d 314, 319-320; Estate of Resler (1954) 43 Cal.2d 726, 734 [278 P.2d 1]; Estate of Jones (1961) 55 Cal.2d 531, 536 [11 Cal.Rptr. 574, 360 P.2d 70]; Estate of Karkeet (1961) 56 Cal.2d 277, 283 [14 Cal.Rptr. 664, 363 P.2d 896].
[fn. 12] 12. Sections 104, 106; accord: In re Schedel (1887) 73 Cal. 594, 596-597 [15 P. 297]; In re Walkerly (1895) 108 Cal. 627, 659, 660 [41 P. 772, 49 Am.St.Rep. 97]; Estate of Tompkins (1901) 132 Cal. 173, 176 [64 P. 268]; Estate of Fair (1901) 132 Cal. 523, 530-532 [60 P. 442, 64 P. 1000, 84 Am.St.Rep. 70]; Estate of Dominici, supra, 151 Cal. 181, 189; Estate of Blake (1910) 157 Cal. 448, 459 [108 P.2d 287]; Estate of Sessions (1915) 171 Cal. 346, 349- 351 [153 P. 231]; Estate of Watts (1918) 179 Cal. 20, 23 [175 P. 415]; Estate of Phelps (1920) 182 Cal. 752, 756 [190 P. 17]; Estate of Doane (1923) 190 Cal. 412, 415 [213 P. 53]; Estate of Ryan (1923) 191 Cal. 307, 310 [216 P. 366]; Estate of Salmonski, supra, 38 Cal.2d 199, 213; Estate of Sargavak, supra, 41 Cal.2d 314, 320-321.
[fn. [13]] [13]. That is "the standard of an individual actor who may use words in a sense wholly peculiar to himself." (9 Wigmore, op.cit, supra, 2458, p. 181, 2467, p. 222.)
[fn. 14] 14. "The truth had finally to be recognized that words always need interpretation; that the process of interpretation inherently and invariably means the ascertainment of the association between words and external objects; and that this makes inevitable a free resort to extrinsic matters for applying and enforcing the document. 'Words must be translated into things and facts.' Instead of the fallacious notion that 'there should be interpretation only when it is needed,' the fact is that there must always be interpretation. Perhaps the range of search need not be extensive, and perhaps the application of the document will be apparent at the first view; but there must always be a traveling out of the document, a comparison of its words with people and things. The deed must be applied 'physically to the ground.' Perhaps the standard of interpretation will limit our search; perhaps the obligation (as some Courts maintain) to enforce the ordinary standard as against the mutual or the individual standard ..., or to enforce the mutual as against the individual standard ..., will render certain data immaterial. But these restrictions are independent of the present principle. Once freed from the primitive formalism which views the document as a self- contained and self-operative formula, we can fully appreciate the modern principle that the words of a document are never anything but indices to extrinsic things, and that therefore all the circumstances must be considered which go to make clear the sense of the words,--that is, their associations with things." (9 Wigmore, op.cit. supra, p. 227, original emphasis.)
[fn. 15] 15. "How can we tell whether a will is clear and definite or ambiguous and uncertain until we know the surrounding facts? If the will would have one meaning if the surrounding facts were ignored, and a different meaning if the surrounding facts were taken into consideration, it would seem that a refusal to consider the surrounding facts whenever testator's intention seems clear from reading the will without considering the surrounding facts, would result in ascribing to testator an intention which he never entertained in fact and which can be shown not to be his intention by the use of methods of construction which are ordinarily looked upon as perfectly proper." (4 Page on Wills, op.cit. supra, p. 59.)
[fn. 16] 16. Accord:pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co., ante, p. 33 [69 Cal.Rptr. 561, 442 P.2d 641]; Continental Baking Co. v. Katz (1968) 68 Cal.2d 512, 521, 522 [67 Cal.Rptr. 761, 439 P.2d 889]; Nofziger v. Holman (1964) 61 Cal.2d 526, 528 [39 Cal.Rptr. 384, 393 P.2d 696]; Imbach v. Schultz (1962) 58 Cal.2d 858, 860 [27 Cal.Rptr. 160, 377 P.2d 272]; Laux v. Freed, supra, 53 Cal.2d 512, 525-527 (Traynor, J., concurring); Estate of Rule (1944) 25 Cal.2d 1, 20-22 [152 P.2d 1003, 155 A.L.R. 1319] (Traynor, J., dissenting); Universal Sales Corp. v. California etc. Mfg. Co., supra, 20 Cal.2d 751, 776.
[fn. 17] 17. We recognize that in contract cases such as Coast Bank and Parsons, supra, the standard of interpretation is normally the "mutual standard of parties to a bilateral act" whereas in will cases, such as the instant one, it is "the individual standard of the testator." (See 9 Wigmore, op.cit, supra, 2458, p. 181.)
[fn. 18] 18. As for example, under section 105 (see fn. 9, ante) which specifically excludes "the oral declarations of the testator as to his intentions." This opinion does not disturb the statutory proscription against the use of such evidence.
[fn. 19] 19. Section 106 provides: "The words of a will are to be taken in their ordinary and grammatical sense, unless a clear intention to use them in another sense can be collected, and that other can be ascertained. Technical words are not necessary to give effect to any species of disposition by a will; but technical words in a will are to be taken in their technical sense, unless the context clearly indicates a contrary intention, or unless it satisfactorily appears that the will was drawn solely by the testator, and that he was unacquainted with such technical sense."
[fn. 20] 20. Excluding however the oral declarations of testatrix as to her intentions. ( 105; see fn. 9, ante,; see fn. 18, ante, and accompanying text.) It is to be noted that no such declarations are herein involved.
[fn. 21] 21. Having concluded that the extrinsic evidence should have been stricken from the record, we need not reach plaintiff's second contention that, even considering such extrinsic evidence, "There is neither jot nor tittle of evidence ... which would support a finding that Mrs. Russell intended to leave nothing to her dog." However, it is noteworthy that, as we pointed out at the beginning of this opinion, the infinitesimal portion of the extrinsic evidence actually referring to the care of the dog was devoid of all probative value.
[fn. 22] 22. As a consequence, the fact that Roxy Russell predeceased the testatrix is of no legal import. As appears, we have disposed of the issue raised by plaintiff's frontal attack on the eligibility of the dog to take a testamentary gift and therefore need not concern ourselves with the novel question as to whether the death of the dog during the lifetime of the testatrix resulted in a lapsed gift. ( 92.)