[Civ. No. 12289. Third Dist. July 26, 1971.]

Estate of ELMER H. VANDERHOOFVEN, Deceased.
MARTHA BIECHNER et al., Claimants and Respondents, v.
THOMAS C. LYNCH, as Attorney General, Objector and Appellant.

## COUNSEL

Thomas C. Lynch and Evelle J. Younger, Attorneys General, and G. A. Strader, Deputy Attorney General, for Objector and Appellant.

Albert G. Bergman, Horace E. Dunning and Lionel T. Campbell for Claimants and Respondents.

## OPINION

**PIERCE, P. J.**—Elmer H. Vanderhoofven (decedent) died July 30, 1962. He left an holographic will dated October 29, 1959, admitted to probate. Crocker-Anglo National Bank was appointed administrator with the will annexed. In a will contest other wills were denied probate. There was an appeal. Judgment was affirmed in an unpublished opinion by the appellate court of the Fifth District. Since neither party has advised us of the contents of this decision and it was not made a part of the record before us, we will assume that the issues raised therein have no relevance to the issues raised in this court.

The parties before us are certain claimants of the estate of the decedent

on the one hand and the State of California, represented by the Attorney General, on the other. The sole issue, as correctly stated by the latter, is whether the trial court correctly or incorrectly interpreted the will in refusing to apply the *cy pres* doctrine with the result that the entire distributable estate passes to the claimants (other than the state). These claimants, eight in number, comprise six siblings of decedent, the sole distributee of the estate of a deceased mother (the mother having died after the death of decedent) and a previous claimant under another will. By stipulation prior to the order herein these eight stipulated that if the common position of all is the proper interpretation of the will each would accept a one-eighth share of the net distributable estate. The probate court decided in their favor. The Attorney General has appealed.

The one page holographic will, its misspelled words retained, provides as follows:

"Oct 29/1959

"Being of sound mind in this will, I must say again to forestall all other wills.

"I will not not not not give or bequith any of my real property or holdings personal or otherwise to anyone other than my fambly, regardless of what I have written before.

"I do give one dollar each to my brothers & sisters and the rest to some Protestant school that is all white of Engingeering training, I care not which.

Elmer H. Vanderhoofven"

We will be principally concerned with the last conjunctive phrase of the will.

Because the *cy pres* doctrine is in essence the crucial hub from which all points in the discussion to follow spoke-out, we will define it. The definition of The Model Act Concerning the Administration of Charitable Trusts, Devises and Bequest is quoted in 4 Scott on Trusts (3d ed.) Charitable Trusts, section 399, pages 3084-3085. No discord to that definition occurs in the California cases. We will quote it (p. 3085): " 'If a trust for charity is or becomes illegal, or impossible or impracticable of fulfillment or if a devise or bequest for charity, at the time it was intended to become effective is illegal, or impossible or impracticable of fulfillment, and if the settlor, or testator, manifested a general intention to devote the property to charity, [a court of equity] may, on application of any trustee, or any interested party or the attorney general of the state, order an administration of the trust, devise or bequest as nearly as possible to fulfill the general charitable intention of the settlor or testator.' " (See *O'Hara* v.

*Grand Lodge I. O. G. T.* (1931) 213 Cal. 131, 140-141 [2 P.2d 21] (which states "the *cy pres* doctrine, is in reality a mere matter of construction" of general charitable intent); see also 2 Rest. 2d Trusts, § 399, p. 305.)

A further observation is pertinent before we progress with this dissertation: there is no specific mention of a trust in the will. We entertain no doubt, however, that the bequest was intended to be for the training of students in engineering in an all-white protestant school.

Also, although the word "trust" 'is not expressly stated, creation of a trust without a specifically named trustee is clearly implied. ██ A trustor need not use the word "trust" or "trustee." If a legal obligation exists to devote a bequest for charitable purposes a trust will not fail for want of a named trustee. (4 Scott on Trusts (3d ed.) Charitable Trusts, § 397, p. 3028.)

Although an argument to the contrary was made orally before this court, we do not think the specification of a "protestant" school as the place at which the engineering training was to be given is significant. It could not be so regarded if a specific school, whether of sectarian or non sectarian origin, had been named (*Estate of Carlson* (1970) 9 Cal.App.3d 479 [88 Cal.Rptr 229] [hg. den.]), and we can see no Fourteenth Amendment or other problem involved merely because a sectarian designation is general rather than specific. That seems to have been the rule universally adopted in the United States. (See note and cases cited in 25 A.L.R.3d 736.)

Specification of an all-white school presents a problem that is a bit stickier. In what has come to be known as the "Girard College Case," *Commonwealth of Pennsylvania* v. *City of Philadelphia* (1957) 353 U.S. 230 [1 L.Ed.2d 792, 77 S.Ct. 806] Stephen Girard, by a will probated in 1831, left a fund in trust to establish a college which was to admit " 'as many poor white male orphans' " of given ages " 'as the said income shall be adequate to maintain.' " The City of Philadelphia was named as trustee. The college was opened in 1848 and operated until the commencement of the litigation in 1954 when two petitioners, Negroes, applied for admission. Except for their race they were qualified. Because they were Negroes they were denied admission. They petitioned the court urging that the trustee had thereby violated the Fourteenth Amendment. The Pennsylvania courts denied relief. On appeal to the United States Supreme Court the state courts were reversed. The Supreme Court held the action of the board "was discrimination *by the State*. Such discrimination is forbidden by the Fourteenth Amendment." (Italics ours.) *Brown* v. *Board of Education* (1954) 347 U.S. 483 [98 L.Ed. 873, 74 S.Ct. 686, 38 A.L.R.2d 1180] was the sole case cited, and other than the short excerpt quoted above the opinion contains no discussion.

The essence of the holding in *Brown* v. *Board of Education, supra,* is that the "separate but equal" doctrine has no place in the field of *public* education.

No case has been cited to us in which a testamentary trust for education of students in a private all-white school has failed on that account. In the note cited above (25 A.L.R.3d 736) cases are cited in which scholarships based upon race or creed have been approved. (That is not quite the same as scholarships *in a school* which discriminates, although the distinction is difficult to define.)

In connection with the illegality of this will, we have considered *Evans* v. *Abney* (1970) 396 U.S. 435 [24 L.Ed.2d 634, 90 S.Ct. 628] which in turn was founded upon the earlier decision of the United States Supreme Court in *Evans* v. *Newton* (1966) 382 U.S. 296 [15 L.Ed.2d 373, 86 S.Ct. 486]. In 1911 United States Senator Bacon of Georgia had made a will conveying a park in trust for the exclusive use of the white people of Macon, Georgia. It is important to note that Senator Bacon's will was more specific in expressing the testator's intent than is the will before this court. He, while professing "the kindest feeling [for Negroes], and for many of them esteem and regard" added, "I am, however, without hesitation in the opinion that in their social relations the two races . . . should be forever separate . . . ." In *Evans* v. *Newton, supra,* the court had held that the will violated the Fourteenth Amendment and the provision of the will referred to above could not be enforced. Thereafter, and after a change of trustees, the Supreme Court of Georgia had held that the trust had failed and that the park land had reverted by operation of Georgia law to the heirs of the testator. In *Evans* v. *Abney, supra,* the United States Supreme Court upheld the Georgia courts and in doing so the majority held that the ruling was a matter of state law with no United States constitutional question involved. The court (on pp. 441-442 [24 L.Ed.2d on pp. 641-642]) quoted from Professor Scott who had said: " 'It is not true that a charitable trust never fails where it is impossible to carry out the particular purpose of the testator. In some cases . . . it appears that the accomplishment of the particular purpose *and only that purpose* was desired by the testator and that he had no more general charitable intent and that he would presumably have preferred to have the whole trust fail if the particular purpose is impossible of accomplishment. In such a case the *cy pres* doctrine is not applicable.' " (Italics ours.)

Going back to the Girard College Case, it is relevant to note that there the court after more than a century was concerned with disobedience of the testator's will but not with closing the school. In the instant case we do not face any issue as to what might happen if Negroes applied for admission to

the "all white" engineering school to which decendent's bequest may ultimately be given.

At this juncture on this appeal loose ends should be tied together. Our inquiry does not necessarily end with a determination that the testator's will cannot be enforced as written (whether through illegality, impossibility or impracticability). The *cy pres* doctrine begins at that point; it does not stop there. It will not do merely to say that if and when we wipe out the words "all white" we make a new will for decedent. Of course, we do that—in a sense. The *cy pres* doctrine does that by implication in every case. Unless the testator were to say: "I want my property to go to educate students in an all-white school, but if that is illegal I want it to go to educate students in an integrated school," we are making a will other than that *expressed* by the testator. Actually, under the assumed circumstances no *cy pres* doctrine would be involved. An expressed intent would merely be being carried out. No construction would be necessary and—as we have stated above—*cy pres* is a doctrine of construction.

█ In that construction the issue to be determined is the dominant intent of the decedent. (*Estate of Black* (1962) 211 Cal.App.2d 75, 91-92 [27 Cal.Rptr. 418].) █ Was his dominant intent one of bigotry—to perpetuate the separation of races? Or was it to provide for the education of engineering students, preferably but not exclusively in a protestant all-white school? The probate court determined that the answer to those questions could be reached by examining the face of the will. As shown by its letter opinion, the court, without taking extrinsic evidence, determined that "all white" was the *sine qua non* of decedent's intent and that because it was there the bequest was illegal. It decided that decedent, if thwarted in his expressed wish, would have wanted his estate to be distributed as if in intestacy.[1] Perhaps the probate court was correct as a matter of conjecture, and it may turn out that it was correct as a matter of fact. We do not agree that it was compelled judicially to that conclusion as a matter of law. It is both our prerogative and duty as a reviewing court so to disagree. (*Estate of Russell* (1968) 69 Cal.2d 200, 213 [74 Cal.Rptr. 561, 444 P.2d 353].)

---

[1]In that connection, however, it is to be noted that decedent, on the face of his will, having first stated, "I will not not not not give . . . any of my real property or holdings personal or otherwise to anyone other than my fambly," in the very next sentence gave "one dollar each to my [six] brothers & sisters" who were then his only known heirs at law. Effectually, the probate court's decision would give to these six and two others the entire estate. We point out that if distribution is carried out as expressed in the probate court's decree, the testator's intent obviously is not being carried out. On the face of the will his expressed intents are multiple and contradictory. We fail to see the logic in adopting one only of several tenable courses without recourse to possible extrinsic evidence as a source of possible clarification.

■ To be workmanlike in the judicial processes of this intermediate appeal certain rules of construction of wills repeated so frequently as to have become bromides may be expressed at this stage of this opinion: The paramount rule is that the will is to be construed according to the testator's intent as expressed therein. This intention will be given effect as far as possible. (Prob. Code, § 101; *Estate of Russell, supra,* 69 Cal.2d 200, 205.) ■ The presumption is that the testator intended to dispose of all of his property. Stated in other words, clauses should receive a broad and liberal interpretation with a view to preventing intestacy. (*Id.,* at p. 213.)

■ "[A]n ambiguity is said to exist when, in the light of the circumstances surrounding the execution of an instrument, 'the written language is fairly susceptible of two or more constructions.' [Citations.]" (*Id.,* pp. 211-212.)

Ambiguities may be of two kinds, patent or latent. But, as stated in *Estate of Russell, supra* at page 209: " 'Words are used in an endless variety of contexts. . . . The exclusion of parol evidence regarding . . . [surrounding] circumstances merely because the words do not appear ambiguous to the reader can easily lead to the attribution to a written instrument of a meaning that was never intended.' "

In *Estate of Black, supra,* 211 Cal.App.2d 75, a testatrix left her entire estate for educational purposes: "To The University of Southern California known as The U.C.L.A." The probate court, apparently either not aware at all, or too well aware, of the heated cross-town rivalry of the two Los Angeles institutions, decided there was no ambiguity and refused to consider extrinsic evidence. Both institutions and the heirs at law were before the court. No offer of proof of extrinsic evidence was made. ■ On review the appellate court found a "latent" ambiguity to exist; it found further that extrinsic evidence should have been admitted to settle the ambiguity, if possible, and held that the failure to make a formal offer of proof did not preclude argument of that issue on appeal, stating (at p. 90): "It would be a miscarriage of justice, in our opinion, to uphold a decree in favor of the respondents . . . ." (The probate court had decided in favor of the regents of the University of California.)

It should be emphasized that the court also held that while it was probable that extrinsic evidence would prove that one of the two universities would prevail, such evidence "may show that the testatrix intended that one institution should benefit and no other, thus negativing a general charitable intent, but leaving the identity of that institution so uncertain as to require an intestacy." (*Id.,* p. 91.)

We accept *Estate of Black, supra,* as a pattern and follow its precepts here. ■ In the will before this court the lines are not as sharply

drawn as in *Estate of Black*. They are, in our opinion, visible enough for a possible application of the *cy pres* doctrine if extrinsic evidence can settle the question which we have posed above. Was bigotry—the desire to segregate the black and white races—the intent of decedent so dominating his mind that he would prefer to have his entire estate (rather than the $6 expressly given) go to his brothers and sisters than to have the student (or students) to be trained receive such training in a school which might then or thereafter admit blacks? Or was his expression of an all-white school as a situs for the training of an engineering student subordinate to his general charitable wish? Adequate evidence may be available. Justice, it seems to this court, cannot be done until all avenues of ascertainment have been tried.

The order and decree appealed from is reversed and the cause remanded for further proceedings consistent with this opinion.

Janes, J., concurred.

Friedman, J., concurred in the result.

Appellant's petition for a hearing by the Supreme Court was denied September 22, 1971. Mosk, J., was of the opinion that the petition should be granted.