[Civ. No. 36138. Second Dist., Div. Two. Feb. 16, 1971.]

Estate of AIMEE JERGENS SOMERMEIER, Deceased.
BETSY KUPRASH, as Trustee, etc., et al., Petitioners and Appellants, v.
THOMAS G. SOMERMEIER, JR., Individually and as Trustee, etc.,
et al., Claimants and Respondents.

## COUNSEL

Blum & Propper, Ivon B. Blum  and Ronald A. Litz for Petitioners and Appellants.

Gilbert, Thompson & Kelly, Coleman J. Lesser and William I. Gilbert, Jr., for Claimants and Respondents.

## OPINION

**HERNDON, J.**—The question presented by this appeal is whether or not the court below arrived at a reasonable and tenable interpretation of an ambiguous provision of the will of Aimee Jergens Somermeier, deceased, hereinafter referred to as decedent. She was one of the four children of Andrew Jergens, Sr., founder of the Andrew Jergens Company. The major part of her estate consists of the 79,200 shares of that company which she owned at the time of her death on December 30, 1961.

Appellants represent the interests of Aimee Jergens Wurzenrainer, the 18-year-old great granddaughter of the decedent. Appellant Betsy Kuprash, Aimee's mother and decedent's granddaughter, is named trustee of a trust created by decedent's will for Aimee's benefit. Appellant Ivon B. Blum is Aimee's guardian ad litem.

Respondent Thomas G. Somermeier, Jr., decedent's son, who is named executor of her will, appears individually and in his capacity as trustee for his two children, Thomas J. and Suzanna, the beneficiaries of another trust created by the will. Respondent Coleman J. Lesser appears in his capacity as guardian ad litem for Thomas J. and Suzanna Somermeier, minors.

The pertinent provisions of the will are sufficiently quoted or summarized as follows:

"THIRD: I declare that I am a widow and that I have one child now living, my son, Thomas G. Somermeier, Jr., and that I have one deceased child, Ann Jergens Armour, whose surviving daughter is Betsy Ann Sheldon Kuprash. That said Betsy Ann Sheldon Kuprash has a daughter, Aimee Jergens Wurzenrainer. That my son, Thomas G. Somermeier, Jr., has two children by adoption, Thomas J. Somermeier and Suzanna Somermeier, and that his wife, Sue Somermeier, has three adopted children by a prior marriage, named Pamela Miller, Lucinda Miller and Stephanie Miller who live with my son and his wife."

Clause *Thirteenth* bequeaths art objects one-half to decedent's son, Thomas Somermeier, Jr., and one-half to her granddaughter, Betsy Kuprash.

Clause *Fourteenth* bequeaths decedent's one-half interest in the home and household furniture and furnishings to her son, Thomas G. Somermeier, Jr., who was the owner of the other one-half interest in the home property.

Clause *Fifteenth*—This section of the will creates "The Thomas Jergens

Somermeier Trust" which is to receive income from the trust created by Clause Twentieth of the Will for the benefit of Thomas, the adopted son of decedent's son, Thomas G. Somermeier, Jr.

Clause *Sixteenth*—This section of the will creates "The Suzanna Jergens Somermeier Trust" which is to receive income from the trust created by Clause Twentieth of the will for the benefit of Suzanna, the adopted daughter of decedent's son, Thomas G. Somermeier, Jr.

Clauses *Seventeenth, Eighteenth* and *Nineteenth*—These sections of the will create contingent trusts for the benefit of Pamela Miller, Lucinda Miller and Stephanie Miller, the adopted daughters of the wife of decedent's son Thomas. The creation of the trust provided for in these sections of the will are contingent upon the adoption of Pamela, Lucinda and Stephanie by decedent's son, an event which had not occurred at the time of the hearing in the court below.

"TWENTIETH: I give, devise and bequeath all of the stock which I may own at the time of my death in the Andrew Jergens Company, together with such stock over which I may have power of appointment in the said Andrew Jergens Company, to my son, Thomas G. Somermeier, Jr., in trust, for the following uses and purposes: . . ."

The named income and corpus beneficiaries of the trust created by the last quoted provisions are Thomas J. Somermeier and Suzanna Somermeier, the grandchildren of decedent and the children of decedent's son, Thomas G. Somermeier, Jr. Decedent's son Thomas has a substantial interest in this trust aside from his being the named trustee. He is granted the power to invade the corpus of the trust throughout his life on a noncumulative basis in an amount not to exceed the greater of 5 percent of the corpus or $5,000 annually.

"TWENTY-FIRST: In the event my son, Thomas G. Somermeier, Jr., predeceases me leaving no male issue, by adoption or otherwise, then in such event the Andrew Jergens Company stock shall not be distributed to the trust as set forth in Clause Twentieth, but shall instead be distributed to the trust set forth in Clause Twenty-Third of this Will."

Clause *Twenty-Second*—This section of the will creates "The Aimee Jergens Wurzenrainer Trust" which is to receive the income from the trust created by Clause Twenty-Third primarily for the benefit of decedent's great granddaughter, Aimee Wurzenrainer.

"TWENTY-THIRD: I give, devise and bequeath stocks and bonds or cash at their appraised value equal to one-third (⅓) of the value of the Andrew Jergens Company stock heretofore bequeathed in Clause

Twentieth of this Will, at the value of One Hundred Dollars ($100.00) per share, to my granddaughter, Betsy Ann Sheldon Kuprash, in trust, for the following uses and purposes: . . ."

The foregoing clause is the provision of the will which is infected with the ambiguity giving rise to this litigation. The named income and corpus beneficiary of the trust created by the foregoing quoted provision is Aimee Wurzenrainer, decedent's great granddaughter. However, Betsy Kuprash, Aimee's mother and decedent's granddaughter, has a substantial interest in this trust in addition to her being the named trustee. She is granted a power of invasion of the corpus of the trust, throughout her life, on a noncumulative basis, in an amount not to exceed the greater of 5 percent of the corpus or $5,000 annually.

At the time she executed her will on March 9, 1961, decedent owned 4,400 shares of the common stock of the Andrew Jergens Company. This stock was without nominal or par value. For at least three or four years prior to decedent's death, plans to split the Jergens stock had been under consideration by the officers and directors of the company. An 18 for 1 split was authorized and made effective as of August 1, 1961, whereupon decedent became the owner of the 79,200 shares which she held at the time of her death on December 30, 1961.

The 79,200 shares of Jergens stock were appraised by the State Inheritance Tax Appraiser at $2,415,600. The aggregate appraised value of the other stocks, bonds and cash in the estate was $541,573.58.

The ambiguity in the twenty-third clause of the will became obvious. Literally construed it would have given the trust thereby created for the primary benefit of Aimee Wurzenrainer, decedent's great granddaughter, "stocks and bonds or cash at their appraised value equal to one-third of the value of the Andrew Jergens Company stock [specifically bequeathed to Thomas G. Somermeier, Jr. in trust by Clause Twentieth of the will] at the value of $100 per share." That is to say, 79,200 times $100 equals $7,920,000 times one-third equals $2,640,000. This literal result was rejected by both parties and by the trial court. The value of the resultant bequest would have exceeded the aggregate appraised value of all of the Jergens stock in the estate, and manifestly this was not the intention of the testatrix.

### The Trial Court's Interpretation

By the order here under review the court below held as follows: "That decedent, Aimee Jergens Somermeier, intended by Paragraph Twenty-Third of her will to bequeath to Betsy Ann Sheldon Kuprash, in trust, for

the benefit of Aimee Jergens Wurzenrainer, a demonstrative gift of stocks, bonds or cash of the value of $146,000."

The findings of fact upon which the order is based include the following:

"21. The Court finds it is true that when [decedent] executed her will on March 9, 1961, she was aware of the fact that she owned 4,400 shares of common stock without par value of [Andrew Jergens Company], and when the shares of common stock were split eighteen for one on August 1, 1961, [decedent] was aware of such stock split.

"22. The Court finds it is true that the phrase in Clause TWENTY-THIRD of the Will of [decedent], 'at a value of $100.00 per share', was intended by [decedent] to fix the value of the shares of common stock of the [Andrew Jergens Company], for the sole purpose of enabling determination of the value of the bequest to the legatees named in Clause TWENTY-THIRD.

"23. The Court finds it is true that [decedent] intended to refer to the shares of common stock without par value of [Andrew Jergens Company] owned by her on March 9, 1961, when she referred in Clause TWENTY-THIRD of her Will to the value of [Andrew Jergens Company] stock at $100.00 per share.

"24. The Court finds it is true that [decedent] intended, in Clause TWENTY-THIRD of her Will, to fix and establish a value of the shares of common stock without par value of [Andrew Jergens Company], which she had bequeathed in Clause TWENTIETH of her Will, and that she fixed such value in Clause TWENTY-THIRD, for the purpose of enabling distribution to the legatees of Clause TWENTY-THIRD, of stocks and bonds or cash, at an indisputable and easily ascertainable value.

"25. The Court finds it is true that [decedent] did not intend under Clause TWENTY-THIRD of her Will that the legatees thereof would receive stocks and bonds or cash having a value equal to one-third of the common stock without par value of the [Andrew Jergens Company] based upon the number of shares owned by her at her date of death attributable to a stock split that occurred subsequent to execution of her Will on March 9, 1961. It is true that [decedent] did not intend that the legatees of Clause TWENTY-THIRD were to obtain stocks and bonds (at their appraised value) or cash, having a value equal to $100.00 multiplied by one-third of 79,200 shares, or $2,640,000.00

"26. The Court finds it is true that it was not the intent of [decedent], in Clause TWENTY-THIRD of her Will that the $100.00 per share value

which she assigned to the common stock of the [Andrew Jergens Company], was to be multiplied by the number of shares she specifically bequeathed under Clause TWENTIETH, as increased by the stock split of August 1, 1961.

"27. The Court finds it is true that [decedent] did not intend by the use of the phrase 'at a value of $100.00 per share' in Clause TWENTY-THIRD of her Will, to identify or describe the shares of common stock without par value of the [Andrew Jergens Company] which she owned at the date of execution of her Will or at the date of her death, and that such phrase does not constitute a misdescription of the shares of [Andrew Jergens Company] stock that [decedent] owned on March 9, 1961, or any other subsequent date."

*Appellants' Interpretation*

The interpretation advanced by appellants has been characterized in their briefs as "the dominant meaning interpretation." The argument in support of this interpretation is summarized as follows in the opening brief:

"Appellant suggests that Clause Twenty-Third of Decedent's will should be interpreted to give effect to Mrs. Somermeier's dominant estate plan and intention to benefit both the Somermeier children and Decedent's namesake and great-granddaughter, Aimee, affectionately known as 'Aimee, Jr.'. The dominant language of Clause Twenty-Third indicates the intention on the part of the Decedent to give to Aimee, Jr., in trust, stocks and bonds or cash, at their appraised value, equal to one-third *of the value* of *all* of the Andrew Jergens Company common stock which Decedent owned at the date of her death and bequeathed in Clause Twentieth.

"Clause Twentieth of Decedent's will to which the Clause Twenty-Third computation is tied disposed of all of Decedent's Andrew Jergens Company stock owned at death. The Trial Court found that Decedent by Clause Twentieth intended to dispose of all of her Jergens stock at death. Decedent structured her estate plan so that the bequest of Clause Twenty-Third to Aimee, Jr. would be related to one-third of the value of all such Jergens stock owned by Decedent at her death.

"It was Decedent's dominant plan, therefore, to dispose of all of her Jergens stock at death to the Somermeier branch of the family and to dispose of other assets at appraised value having one-third of the value of all such Jergens holdings to the Armour (Kuprash) branch of the family. The change in the number of Jergens shares resulting from the stock split did not result in a change in the value of Decedent's aggregate

Jergens holdings. *Estate of Helfman,* 193 Cal.App.2d 652, 658, 14 Cal. Rptr. 482 (1961).

"The phrase 'at the value of One Hundred Dollars ($100.00) per share' contained in Clause Twenty-Third must be subordinated, as it must have been in the mind of Decedent, to Decedent's dominant program by which her gift to Aimee, Jr. in Clause Twenty-Third is related to 'one-third (⅓) of the value of the Andrew Jergens Company stock heretofore bequeathed in Clause TWENTIETH of this will'. The '$100.000 per share' phrase may nevertheless be given meaning (i) as an additional unnecessary description of the Jergens stock; or (ii) as an inapplicable maximum limitation or 'topper' upon the amount of the bequest.

"Applying this interpretation, Aimee, Jr.'s trust would be entitled to stocks and bonds or cash at their appraised value computed as follows: ⅓ x $2,415,600 = $805,200.

"Aimee, Jr.'s trust is, therefore, entitled to a gross bequest of $805,200. The bequest to Aimee, Jr. pursuant to the interpretation here suggested would be reduced from $805,200 to $541,753.58, which is the appraised value of all of the stocks (other than Jergens stock), bonds and cash inventoried in the Estate.

"This result is neither harsh nor destructive. It does not take from the Somermeier children. It does not destroy the gift to Aimee, Jr. It is supported by a fair construction of the language of the will and the extrinsic evidence."

Appellants point out that the bequest in favor of the children of decedent's son Thomas is vested only as to his two adopted children and that the provisions for the three Miller children are contingent upon their adoption by Thomas. Appellants argue that the provisions of the will, construed in the light of the extrinsic evidence, clearly indicate that "decedent's basic intent and purpose was to treat Thomas' two children and Betsy's child [Aimee] proportionately equally."

### Statement of Facts

In 1963, decedent's father, Andrew Jergens, Sr., created a trust to which he transferred 16,823 shares of the common stock without par value of the Andrew Jergens Company. The trust investment provided inter alia that decedent had an interest in one-third of trust income and corpus, and if she survived her brother, Andrew Jergens, Jr., then she would be entitled to a distribution of her one-third interest in the corpus of the trust. Decedent's one-third interest in the corpus of the trust created by her father

amounted to 5,607⅔ shares of the common stock without par value of the Andrew Jergens Company.

Decedent transferred 394 shares of the common stock without par value of the Andrew Jergens Company, in trust for the benefit of her son, Thomas G. Somermeier, Jr., when he was a child. Decedent also gave, directly, to Ann Jergens Armour, her subsequently deceased daughter who died in 1955, 394 shares of the same stock. Decedent also gave 393 shares of the common stock of the Andrew Jergens Company to her husband, Thomas G. Somermeier.

Decedent's will was executed on March 9, 1961. Prior to the date of execution of the will, and up until the decedent's last illness in late December of 1961, Mrs. Somermeier handled her own business affairs; she bought and sold stocks; she kept track of the stock market herself; she paid special attention to the Andrew Jergens Company affairs; she discussed the affairs of the Andrew Jergens Company as they would arise from time to time with Thomas Somermeier, Jr.; Mrs. Somermeier, up until her final illness, was cheerful and optimistic; she engaged in heavy social activities with her friends and family; she engaged actively in gardening and "loved to play cards with her friends." In short, Mrs. Somermeier was fully alert, a cheerful and outgoing person, and fully attentive to her business and particularly the affairs of the Andrew Jergens Company until her final illness in late December of 1961.

On or about January 6, 1961, Thomas Somermeier, Jr. attended a meeting with certain attorneys and accountants, at which meeting there was discussed the proposed recapitalization and stock split of the Jergens Company stock. Mr. Somermeier attended additional meetings during January of 1961 at which the proposed stock split and recapitalization were discussed. During that same period of time, Mr. Somermeier discussed the matters of a proposed recapitalization and stock split of the Jergens Company stock with his mother. Thus, in January 1961, and before March 9, 1961, the date of execution of decedent's will, decedent was aware that the 18 for 1 stock split of the Andrew Jergens Company stock was under consideration.

For the purpose of showing that the Armour branch of the family, of which Aimee Wurzenrainer is a descendant, had received a large share of the Andrew Jergens wealth prior to decedent's death, respondents have asked this court to take judicial notice of certain designated records of the Superior Court of Los Angeles County. These records prove that appellant Betsy Kuprash, decedent's granddaughter and Aimee Wurzenrainer's mother, had inherited from her mother, Ann Jergens Armour, and from her grandfather, Thomas Somermeier, assets of a value in excess of

$1,600,000 mainly attributable to the common stock of Andrew Jergens Company which decedent previously had given her deceased daughter and her deceased husband. Decedent undoubtedly had knowledge of these gifts to her granddaughter when she executed her will.

### The Construction of the Will Adopted by the Trial Court Is Reasonable and Legally Tenable

As our statement of the case indicates, it is apparent that the trial court construed the provision of the will giving rise to this litigation in the light of a very substantial accumulation of extrinsic evidence offered by the opposing parties. While it is true that the facts proved by this extrinsic evidence are essentially undisputed, the inferences reasonably deducible therefrom are decidedly conflicting. In these circumstances the following from our decision in *Estate of Canfield,* 256 Cal.App.2d 647, 655-656 [64 Cal.Rptr. 195], is indicative of the applicable rules of appellate review: "Finally, of course, it is unnecessary for this court to determine whether the construction of the trust urged by appellants is reasonable or unreasonable. ■ We need only determine that the construction adopted by the trial court is not unreasonable. As stated in *Estate of Northcutt,* 16 Cal.2d 683, 690 [107 P.2d 607]:

" 'Furthermore the construction placed by the probate court on the terms of the will is not unreasonable. And the rule is well settled that where the construction given to an instrument by a trial court is reasonable and appears to be consistent with the intent of the party making it, courts of appellate jurisdiction will not substitute another interpretation, even though it may seem equally tenable with that accorded by the trial court. [Citations.]'

"Contrary to appellants' assertion, this holding in *Estate of Northcutt, supra,* was not disapproved in *Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839]. In fact, from the following quotation from *Parsons* at page 866, the exact converse appears to be true: 'It is true that cases have said that even in the absence of extrinsic evidence the trial court's interpretation of a written instrument must be accepted "if such interpretation is reasonable, or if [it] is one of two or more reasonable constructions of the instrument." (*Prickett* v. *Royal Ins. Co.,* 56 Cal.2d 234, 237 [14 Cal.Rptr. 675, 363 P.2d 907, 86 A.L.R.2d 711]; *Lundin* v. *Hallmark Productions, Inc.,* 161 Cal.App.2d 698, 701 [327 P.2d 166]), or if it is "equally tenable" with the appellate court's interpretation (*Estate of Northcutt,* 16 Cal.2d 683, 690 [107 P.2d 607]; accord. *Estate of Cunco,* 60 Cal.2d 196, 201 [32 Cal.Rptr. 409, 384 P.2d 1]). Such statements are not in conflict with *Estate of Platt, supra,* 21

Cal.2d 343 [131 P.2d 825], if they are interpreted, as they should be, to mean only that an appellate court must determine that the trial court's interpretation is erroneous before it may properly reverse a judgment. (See *Estate of Shannon*, 231 Cal.App.2d 886, 893 [42 Cal.Rptr. 278].) They do not mean that the appellate court is absolved of its duty to interpret the instrument.' "

██ Several applicable principles of testamentary construction provide support for the trial court's determination. In the first place, it gives operative effect to every expression in the paragraph under consideration, whereas the construction advanced by appellants would require that the clause "at the value of One Hundred Dollars ($100.00) per share" be given no operative effect. This would violate the direction of Probate Code section 102 which provides that "The words of a will are to receive an interpretation which will give to every expression some effect, rather than one which will render any of the expressions inoperative; . . ."

Secondly, the adoption of appellants' construction necessarily requires the improbable assumption that decedent had undertaken by her will to make bequests aggregating an amount far in excess of the total value of the assets in her estate. Although the interpretation urged by appellants would entitle the Wurzenrainer trust to a bequest amounting to $805,200, it is necessarily conceded that the bequest must be limited to an amount not in excess of $541,573.58 inasmuch as the latter amount constitutes the appraised value at the date of decedent's death of the assets in her estate other than those specifically bequeathed. Moreover, the effect of adopting this construction would be to nullify decedent's other bequests to relatives, friends, employees and a designated charity. ██ In *Estate of Buck,* 32 Cal.2d 372, 377 [196 P.2d 769], the Supreme Court stated: "Ordinarily a testator is deemed to have acted on the belief that his estate would be sufficient to satisfy all legacies in full unless there had been some expression by the testator to indicate an expectation on his part of a possible insufficiency of assets."

██ Another reasonable inference supporting the trial court's construction of the twenty-third paragraph of the will is that it results in leaving approximately $400,000 in assets available for the payment of expenses of administration with a remaining balance for distribution under the residuary clause of the will to the Somermeier and Kuprash branches of the family. This result is consistent with decedent's apparent intent that her son and his children should hold all of the Jergens stock at least during the survivorship of the son, thus avoiding the necessity of a sale of such stock to provide for the payment of expenses of administration.

Appellants contend that if decedent had not intended them to take one-

third of the total value of all the Jergens stock in her estate at the time of her death, she would have revised her will on or after the stock split which was effected on August 1, 1961. For several reasons this contention is not persuasive. In *Shriners Hospitals for Crippled Children* v. *Emrie* (Mo.) 347 S.W.2d 198, at page 203, the Supreme Court of Missouri stated: ". . . Appellants also argue that it was the intent on the part of Mrs. Bruce that the named legatees receive the stated number of shares of stock with a par value of $5 because she had 14 months from the time of the stock split until her death to change her will and she did not do so. This precise argument was considered in *Fidelity Title & Trust Co.* v. *Young,* 101 Conn. 359, 125 A. 871, 874, and it was there said: 'As to the argument derived from the testator's failure to change his will after the par value of the stock was reduced, it is enough to say that, if we have correctly interpreted the testator's original intent, he might well suppose there was no occasion to make any change.' "

In *Knight* v. *Bardwell,* 45 Ill.App.2d 332 [195 N.E.2d 428, 431], the Illinois Appellate Court commented as follows: "The Home argues that testator's failure to increase the stated number of shares of the will after one split had taken place, when she had an opportunity to do so in the first codicil, indicates that she meant to ratify the reduction in market value of the bequest which took place because of the lowered per-share value resulting at the time of the split. This argument must first overcome the hurdle of awareness of the split on the part of the testator, for if she were unaware of it, she could hardly have intended to use its result. But even if awareness were proven, as seems to be the case here, it does not necessarily demonstrate an intent that the split should reduce the bequest. There is uncertainty in predicting what action would be taken by a testator because of such awareness, and that very uncertainty has previously led this court to discount the value of awareness as determinative of intent. . . .

"There are other facts which have a bearing on our determination of the effect of the second stock split occurring in the year of death, although they are not applicable to the split before the codicil. These relate to a testator's natural inertia and inclination to procrastinate, and, when added to the point we have just been discussing, show further the speculative nature of a determination of intent on the basis of a failure to change the stated number of shares."

In *Estate of Helfman,* 193 Cal.App.2d 652 [14 Cal.Rptr. 482], a major issue involved the significance of a stock split. In that connection the opinion of the Court of Appeal quotes with approval from several leading decisions from other jurisdictions. At page 655 it was observed that "The court in applying the will as of the date of the testator's death, attempts

to ascertain the intent of the testator by the language of the will as understood by the testator at the time he wrote it, related to circumstances then present." And at page 658 the following from *In re Rees' Estate,* 210 Ore. 429 [311 P.2d 438, 443-444], is quoted: " '. . . In a stock split, whether of par value or non-par value stock, one purpose of the split is to divide the original holding in more units or multiples of the same value without disturbing the stockholder's original proportional participating interest in the corporation. . . .

" 'Respondents' argument overlooks the distinctive criterion for determining what a stock split actually is. It is essentially one of form and not of substance. . . .' "

And again at page 657, the following is quoted from *In re McFerren's Estate,* 365 Pa. 490 [76 A.2d 759, 763, 22 A.L.R.2d 451]: " '. . . While the will is only effective at death, the *intent* of the testator governs concerning the identity or value of the legacy. This is governed by the words of the will in relation to the surrounding circumstances. . . .' "

So far as the record indicates, the effectuation of the proposed stock split was not a certainty when the decedent executed her will. She, of course, knew that she then owned 4,400 shares of Jergens stock and, regardless of her appraisal of the prospects of a stock split, it is understandable that she would not have regarded it as a matter of sufficient significance to impel the rewriting of her will after the event. The will clearly expresses decedent's intent that all of the Jergens stock which she owned at the time of her death was to go to her son and to his children. It is unlikely that it would have occurred to her that the stock split would affect this bequest to her son.

The order is affirmed.

Roth, P. J., and Compton, J., concurred.

A petition for a rehearing was denied March 2, 1971, and appellants' petition for a hearing by the Supreme Court was denied April 14, 1971.