[L.A. No. 29922. In Bank. Dec. 15, 1971.]

Estate of JAMES W. DODGE, Deceased.
BARBARA DODGE GILL, Petitioner and Appellant, v.
DOLORES STONE, Claimant and Respondent.

## COUNSEL

Marshall, Lowthorp & Richards, Edward L. Lascher and Richard E. Rader for Petitioner and Appellant.

Heily, Blase, Ellison & Muegenburg, Heily, Blase & Ellison and F. T. Muegenburg, Jr., for Claimant and Respondent.

## OPINION

**TOBRINER, J.** — Appellant Barbara Gill appeals from an order of the Ventura County Superior Court determining the division of the estate of James W. Dodge. That court held that a bequest of "personal property" in paragraph 7 of the will of James Dodge encompassed only personal effects, and that cash, bonds, notes and trust deeds owned by testator passed into a testamentary trust for the benefit of testator's children and his housekeeper Dolores Stone, the respondent on this appeal. We have examined the testator's last will and earlier wills on which that last will was based; we have reviewed the testimony of the parties and of the attorneys who drafted the last and prior wills. We conclude that the interpretation adopted by the trial court accords with the intention and objectives of the testator and should be affirmed.

The testator, James W. Dodge, died March 21, 1968, leaving as his last will a document executed on July 29, 1963, and which has been admitted to probate without contest. The will provides for Frank C. Dodge, Thomas S. Dodge, and Barbara Dodge Besser [Gill], the testator's three children, for John Besser, Barbara's former husband, and for Dolores Stone, the testator's housekeeper. Pursuant to direction of the will, the court named Arthur A. Milligan as executor.

The third, fourth, fifth, and sixth paragraphs of the will state a list of 24 specific bequests to Frank, Barbara, John Besser, and Dolores Stone.

The items so bequeathed consist of household furniture, appliances, sporting goods, linen, and the testator's dog.[1]

The principal controversy in this case concerns the construction of the seventh and eighth paragraphs. Paragraph 7 states: "I hereby give, devise and bequeath to my three children, THOMAS S. DODGE, BARBARA DODGE BESSER and FRANK C. DODGE, share and share alike, by right of representation, all of the rest, residue and remainder of my *personal property,* except all farm equipment and machinery and except my patio furniture, but subject to all other provisions hereof, but my executor shall not deliver any of said personal property until the beneficiaries thereof have delivered to said executor a written agreement as to the method of division of said personal property among them." (Italics added.)

Paragraph 8 establishes a testamentary trust "to hold, manage and dis-

---

[1]Paragraphs 3-6 of the will read as follows:
"THIRD: I hereby give and bequeath to my son, FRANK C. DODGE, if he survives me, the following personal property:
"(a) The picture which I purchased in Germany
"(b) All my guns and gun equipment
"(c) Two of my four folding tables
"(d) One-half of all my bar equipment
"(e) My 'Rooster' set of dishes
"(f) My golf clubs
"(g) My luggage
"(h) My adding machine
"(i) My metal locker
"(j) My filing cabinet
"(k) RCA television set located in my bedroom.
"FOURTH: I hereby give and bequeath to my daughter, BARBARA DODGE BESSER, if she survives me, the following personal property:
"(a) My world globe
"(b) My 'Quail Lamp.'
"FIFTH: I hereby give and bequeath to my son-in-law, JOHN L. BESSER, my Bell & Howell slide projector.
"SIXTH: I hereby give and bequeath to DOLORES STONE the following personal property:
"(a) My RCA color television set
"(b) All of my kitchen utensils and dishes, except as otherwise herein expressly provided
"(c) My typewriter
"(d) My linen
"(e) All of my reducing and exercise equipment
"(f) Two of my four folding tables
"(g) One-half of my bar equipment
"(h) My washing machine
"(i) My dog named 'Heller'
"(j) My potted plants."

tribute . . . all of the rest, residue and remainder of my property."[2] The will names Barbara and her issue, Frank and his issue, Thomas, and Dolores as beneficiaries; it makes no provision for the issue, if any, of Thomas and Dolores. It prohibits the beneficiaries from assigning their interests, and protects them against creditors. The trustee is to distribute the income regularly and may, in his discretion, invade principal to provide for reasonable support, care, and education of the beneficiaries. The trust terminates 21 years after the death of the last of testator's children; the res then devolves upon the remaining beneficiaries. The will also provides that Dolores may continue to live in the testator's residence, rent

---

[2]The portions of paragraph 8 of the will relevant to the present controversy read as follows:

"EIGHTH: I hereby give, devise and bequeath to ARTHUR A. MILLIGAN, hereinafter referred to as 'trustee,' in trust, to hold, manage and distribute, as hereinafter provided, all of the rest, residue and remainder of my property.

"The provisions and conditions of the trust are as follows:

"1. This trust is created for the benefit of BARBARA DODGE BESSER, and her issue, including adopted persons, by right of representation, FRANK C. DODGE, and his issue, including adopted persons, by right of representation, and DOLORES L. STONE, share and share alike. Also for THOMAS S. DODGE as hereinafter provided in subparagraph 5 of this paragraph EIGHTH.

"2. The trust herein created shall cease and terminate twenty-one (21) years after all of my said children are dead, except that as to DOLORES L. STONE and THOMAS S. DODGE it shall terminate at their respective deaths and their interest shall augment the interests of the remaining beneficiaries.

"3. The beneficiaries herein named are hereby restrained from anticipating, encumbering, alienating, or in any manner assigning his or her interest or estate in either principal or income of his or her trust and are without power to do so; nor shall such interest or estate be subject to his or her liabilities or obligations or other legal process, bankruptcy proceedings or claims of creditors or otherwise. . . .

"4. If the payments from this trust to which any beneficiary is entitled shall be insufficient, in the discretion of the trustee, to provide for his or her reasonable support, care, comfort, medical, hospital and nurse services, maintenance and/or education, the trustee may pay to him or her or apply for his or her benefit so much of the principal as the trustee may deem proper or necessary for that purpose.

"5. My residence and the yard area immediately surrounding said residence, having a frontage of 154 feet on Walnut Drive and a depth of 197 feet shall be leased furnished by my trustee separately from the lease of any other property that might be leased, and such portion of the net rental income as is deemed necessary, in the absolute discretion of the trustee to support and maintain THOMAS S. DODGE, after paying all taxes and expenses attributable to said residence, shall be paid to my son, THOMAS S. DODGE, monthly. . . .

"11. DISTRIBUTION OF INCOME

"The trustee shall pay to or apply for the benefit of the trust beneficiaries, in monthly or other convenient installments not less frequently than quarterly, the net income from the trust estate with the right, however, to withhold from the net income reasonable amounts to pay for expenses and taxes.

"12. DISTRIBUTION OF PRINCIPAL

"Twenty-one (21) years after the death of all of my said children, the trustee shall pay and distribute to the remaining trust beneficiaries, as individuals, the trust estate and any accumulations thereof."

free, for two months after testator's death; thereafter the trustee is to rent the furnished residence separately from all other trust property and ɪˉˉe such portion of the net rental to support Thomas as the trustee deems necessary.

The executor filed an inventory and appraisement of the estate. Excluding items of no value, and items subject to specific bequests or disposition, the estate comprises the following assets:

| | | |
|---|---|---:|
| 1. | Cash | $ 2,688.67 |
| 2. | Bank of America savings account | 7,211.90 |
| 3. | United States Treasury notes | 34,650.00 |
| 4. | Note secured by trust deed, executed February 19, 1962, hereafter referred to as the "Dellar note," plus accrued interest | 39,802.50 |
| 5. | Note secured by trust deed, executed December 16, 1963, hereafter referred to as the "Greenberg note," plus accrued interest | 168,438.27 |
| 6. | Diamond ring | 100.00 |
| 7. | Tractor | 500.00 |
| 8. | Federal and state tax refunds | 2,199.54 |
| 9. | Due from health insurance company | 231.00 |
| 10. | Testator's residence and furnishings | 45,000.00 |
| 11. | Mayfair Theater property | 75,000:00 |
| 12. | Mayfair Theater equipment | 4,000.00 |

The parties agree that the diamond ring (item 6) is personal property passing under paragraph 7 of the will, and that the residence (item 10) and Mayfair Theater (item 11) are real property and become part of the trust res. They dispute the disposition of the other listed items.[3] Barbara contends that such items are personal property and should be divided among the three children pursuant to paragraph 7. Dolores contends that the term "personal property" in paragraph 7 is limited to personal effects and all other items go to augment the trust res under paragraph 8.

When Dolores asked the court to order distribution of all items other than personal effects to the trustee, the executor, uncertain as to which

[3]The trial court held that the testator intended the theater equipment to remain with the theater and thus pass into the trust. Barbara does not seriously dispute this award.

property to distribute, petitioned the court to determine that issue. The superior court, after hearing evidence, found in favor of Dolores; it determined that only the diamond ring of the listed property passed under paragraph 7, and the balance of the listed items were part of the trust under paragraph 8. Barbara appeals from the ensuing order.

We begin our discussion with a statement of the applicable principles of appellate review. As set forth in *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839], it is "a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." The possibility that conflicting inferences can be drawn from uncontroverted evidence does not relieve the appellate court of its duty independently to interpret the instrument; it is only when the issue turns upon the credibility of extrinsic evidence, or requires resolution of a conflict in that evidence, that the trial court determination is binding. (*Parsons* v. *Bristol Development Co.*, 62 Cal.2d at p. 866, fn. 2.)[4] These same principles define the appellate function in the construction of wills. (*Estate of Russell* (1968) 69 Cal.2d 200, 212 [70 Cal.Rptr. 561, 444 P.2d 353].) Since the record in the present case discloses no conflict in the extrinsic evidence, and no issues of credibility, it becomes our task to arrive at an independent interpretation of the will.

In reaching that interpretation, we may utilize extrinsic evidence to aid in construing the will if we find that the will is "ambiguous" or, more precisely, that in the light of both the language of the will and the circumstances under which it was made, the will is reasonably susceptible of more than one interpretation. (See *Estate of Russell* (1968) 69 Cal.2d 200, 208-211 [70 Cal.Rptr. 561, 444 P.2d 353].) In the present case, the key phrase—"personal property"—is one whose inherent ambigu-

---

[4]Dolores contends that when the interpretation of a written instrument turns on conflicting inferences deducible from undisputed evidence, that interpretation adopted by the trial court must prevail on appeal if it is "reasonable" and "supported by substantial evidence." (See *Estate of Northcutt* (1940) 16 Cal.2d 683, 690 [107 P.2d 607]; *Estate of Somermeier* (1971) 15 Cal.App.3d 224, 233 [92 Cal.Rptr. 872]; *Estate of Canfield* (1967) 256 Cal.App.2d 647, 655-656 [64 Cal.Rptr. 195].) As we pointed out in *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839], cases using such language are accurate only "if they are interpreted, as they should be, to mean only that an appellate court must determine that the trial court's interpretation is erroneous before it may properly reverse a judgment. . . . They do not mean that the appellate court is absolved of its duty to interpret the instrument." We add that if, upon such interpretation, the appellate court determines that the trial court's interpretation is in error, it may not uphold the judgment merely because the trial court's error was reasonable.

ity has been noted in many court decisions.[5] The Civil Code gives that term a broad definition, encompassing all property not classed as real property (Civ. Code, § 663), including "money, goods, chattels, things in action, and evidences of debt" (Civ. Code, § 14). The phrase, however, carries a meaning in the popular sense that denotes "only such goods and chattels as are the subject of personal use or comfort. . . ." (*Estate of Kruger* (1942) 55 Cal.App.2d 619, 623 [131 P.2d 619; see *Estate of Graham* (1957) 49 Cal.2d 333, 337 [316 P.2d 945].)

In the instant case among the most valuable items of property where classification is disputed are the Greenberg and Dellar notes and trust deeds. The uncertain meaning of the phrase "personal property" becomes especially troublesome when the task calls for a classification of debts secured by liens on realty. ■ By one definition, a note and deed of trust merely constitute evidences of debt and therefore fall under the definition of personal property in Civil Code section 14 (*Johnson* v. *National Surety Co.* (1931) 118 Cal.App. 227, 229 [5 P.2d 39]; see *Bank of America Assn.* v. *Sparr R. Corp.* (1937) 20 Cal.App.2d 10 [66 P.2d 476]). Yet attorneys as well as laymen commonly describe the beneficiary of a trust deed as "owning" a lien upon, or security interest in, real property.[6] In *Estate of Moore* (1955) 135 Cal.App.2d 122 [286 P.2d 939], the court reviewed the prior cases involving both mortgages and trust deeds, and concluded that "any rule that rests upon the assumption that the holder of a trust deed note does not have any interest in the land finds no substantial basis in California law." (135 Cal.App.2d at p. 132.) The court then held that a purchase money note and trust deed, not specifically mentioned in the will, passed under the testator's devise of "real estate owned by me." (See also *Estate of Trainer* (1958) 161 Cal.App.2d 353, 354 [326 P.2d 520].)

■ The bulk of the property in dispute consists of notes secured by trust deeds, government bonds, a bank account, and cash—items which are personal property under the Civil Code definition but which are not so classed under other definitions in common usage. Consequently we

---

[5]In *Estate of Graham* (1957) 49 Cal.2d 333, 336 [316 P.2d 945], we observed that "The ambiguity in the phrase 'personal property' is apparent from several cases that discuss the different meanings ascribable to it. (See *Estate of Marin,* 69 Cal.App. 2d 147, 150 [158 P.2d 412]; *Estate of Duraind,* 51 Cal.App.2d 206, 211-212 [124 P.2d 330]; *Estate of Combs,* 136 Cal.App. 286, 291 [28 P.2d 711]; *Estate of Kruger,* 55 Cal.App.2d 619, 623 [131 P.2d 619]; *Estate of La Fetra,* 14 Cal.App.2d 599, 602-603 [58 P.2d 678]; *Estate of Puett,* 1 Cal.2d 131, 134 [33 P.2d 825].)" (See also *Estate of Barbikas* (1959) 175 Cal.App.2d 285 [345 P.2d 968]; *Estate of Lovejoy* (1940) 38 Cal.App.2d 69 [100 P.2d 547].)

[6]See, *Childs etc. Co.* v. *Shelburne Realty Co.* (1943) 23 Cal.2d 263, 268 [143 P.2d 697]; *Estate of McLaughlin* (1929) 97 Cal.App. 485, 489 [275 P. 875].

find that the language of the will is not sufficiently certain to provide an unambiguous guide to the distribution of that property. We conclude, therefore, that the superior court did not err in resorting to extrinsic evidence to interpret the will and that in our independent construction of the will we may also make use of that evidence.

We now embark on the task of construing the will of James W. Dodge.[7] We shall point out that although the parties advance various arguments on this subject, selecting phrases of the will and bits of testimony to support their contentions, certain uncontroverted facts emerge from this sea of contention. These salient considerations are that the testator intended to deny Thomas any control over substantial amounts of cash or liquid assets, that he intended to provide for Thomas and for Dolores Stone through the spendthrift trust established in paragraph 8, and that he intended to use the trust to pass his estate to Frank and Barbara's children while avoiding a second estate tax. These objectives can be fulfilled only if the major part of his estate, including cash and liquid assets, passes under paragraph 8 into the trust. We therefore conclude that the construction adopted by the trial court, which limits paragraph 7 to personal effects, will subserve the testator's over-all plan and objectives; and interpretation of paragraph 7 to include all items classed as personal property under the Civil Code definition, on the other hand, would defeat the testator's objectives by providing Thomas with approximately $70,000 in cash or liquid assets while denying the trust sufficient assets to accomplish its goals.

Turning to a more detailed examination of the evidence, we note that the trial court admitted into evidence several prior wills of the testator. All of these wills disclose two common characteristics: the testator desired to leave in trust a substantial part of his estate to his son, Thomas, and wanted to protect this bequest from dissipation by Thomas. The first two wills, dated October 31, 1957 and June 12, 1959, drafted by Mark Durley, then the testator's attorney, divided all the property into three parts, one part to Frank, one part to Barbara, and significantly, one part to a spendthrift trust for the benefit of Thomas, with remainder to his children.

The next will, that of February 15, 1961, drafted by Durley's law partner, Dale Cearnal, contains the structure, and often the exact language, of the final will. Its further significance lies in the fact that Cearnal pre-

---

[7]The trial court wrote a thorough memorandum opinion analyzing the will and the extrinsic evidence. The discussion in this opinion follows, for the most part, the position of the trial court.

served the notes of his conversation with testator in regard to it.[8] This will provided in paragraph 3 for cash bequests of $4,000 each to Chester Tait and Dolores Stone. Paragraph 4 then devised to his children, in equal shares, "all of my personal property, except all farm equipment and machinery" and required the children to deliver a written agreement to the executor specifying the mode of division. Paragraph 5 established a testamentary trust, essentially identical to that of the final will except that Thomas's issue were included as beneficiaries, but Dolores Stone was not.

The next will, dated May 22, 1962, also drafted by Cearnal, is based on the will of February 15, 1961. It increases the cash bequests to $6,000 each,[9] excludes Thomas's issue as beneficiaries under the trust, and adds the lengthy list of specific gifts of tangible property. During the interval between the two Cearnal wills the testator sold the Dellar property and received in return a $75,000 note secured by a deed of trust, a fact known to Cearnal; yet the May 22 will neither mentions that transaction nor changes the relevant dispositive language of the will.

The will admitted to probate, that of July 29, 1963, was drafted by Ben Nordman, another attorney. Nordman testified that testator brought with him a copy of the May 22, 1962, will and directed him to copy that will with certain changes, the most significant of which was to delete the cash bequests and add Dolores Stone as a beneficiary of the trust. Nordman copied paragraph 7 verbatim from the 1962 will.

None of the wills supply us with a definition of "personal property." Apparently none of the attorneys who drafted these wills discussed or explained that phrase to testator, nor did any, so far as they can recall, state specifically to him what assets would pass under the various provisions of the will. Each of the wills establishes a spendthrift trust, and in

---

[8]Cearnal's notes state "all personal property except boat, personal car and farm machinery and cash to be divided equally among children when they have agreed as to method of division." The will expressly excluded farm machinery from the division of personal property, and directed the executor to sell the boat and car. Although the testator told Cearnal he had $21,000 in cash, the only mention of cash in the will is the specific bequests of paragraph 3, which total $8,000.

Both parties seek to use the Cearnal notes to support their claim. Dolores argues that the notes indicate that the testator intended that the cash, after payment of bequests, pass into the trust. Barbara argues that the notes show that the testator believed that the term "personal property" included not only personal effects but also cash and farm machinery, and that the exclusion of farm machinery from paragraph 4, and the failure to exclude cash, shows the testator's intent to include cash under that provision. The difficulty with both arguments is that Cearnal could not recall his conversation with the testator, nor explain his failure to exempt cash from paragraph 4; consequently we cannot determine whether the will or the notes are in error.

[9]A codicil executed in June of 1962 deleted the bequest to Chester Tait.

each Thomas is either the sole beneficiary, or the beneficiary with the largest individual share.[10] Each of the attorneys testified to testator's desire to preclude the danger that Thomas might dissipate his share of the estate and to protect Thomas from himself and from his creditors by a spendthrift trust.[11]

The value of testator's estate, before taxes and expenses of administration, approximates $380,000. Its value in 1963 was the same. Under Barbara's interpretation of the will, the property passing under paragraph 7 would compute a value of $263,423.67; after payment of taxes and expenses, Thomas would receive a total of about $60,000-$70,000 in cash and assets readily converted into cash. He would thus have at his disposal sums far in excess of that intended by the testator. At the same time, the trust assets before taxes and expenses would total $120,000; Thomas's annual income would probably run under $5,000. To safeguard this sum from Thomas and his creditors while providing $60,000-$70,000 free of such protection would be futile indeed.

The trust serves other purposes. One is to provide an income for Dolores Stone, a woman without other means of support. Yet under Barbara's interpretation, Dolores's annual income from that trust would be only about $2,000, a sum insufficient for comfortable living. Another

[10]The last will apparently gives Thomas the entire income from the rental of testator's house, plus a one-fourth share in the other income generated by the trust assets. The trial judge, however, pointed out a possible ambiguity, in that the will provides that Thomas is a beneficiary of the trust "as hereinafter provided in subparagraph 5 of the paragraph EIGHTH." Subparagraph 5 is the provision which permits the trustee to use the net income from the rental of the residence for Thomas's support. If this provision means that Thomas does not share in the other income of the trust, it would be a radical departure from earlier wills in which Thomas was to share equally with his siblings *and* receive the income from the residence.

[11]Ben Nordman's testimony is explicit:
"Q. Did Mr. Dodge discuss with you his son Tom at that time [of preparing the will]? . . .
"A. . . . [T]he statement . . . amounted to the fact that he did not want Tom to have a large amount of money in his hands at any one time as he felt that he wouldn't be able to handle it. Secondly, that he did want to make provision for his son Tom on a continuing basis.
"Q. Did he, in effect, indicate to you that he wanted his son Tom to have an income but in such form that he wouldn't be able to dissipate the corpus?
"A. I believe that's a reasonable statement of the essence of his thoughts as conveyed to me." (Reporter's transcript, pp. 88-89.)
Attorney Cearnal's notes state that the testator did not want trust property to be available for Tom's child support. Attorney Durley testified that the testator did not want Tom to be in a position to squander everything that he received from the estate. Charles Conway, the testator's accountant, also testified that the testator feared that Thomas would waste his inheritance and discussed protecting Thomas by a trust which would pay out income in a regular pattern.

purpose of the trust lies in the avoidance of an estate tax on the death of Frank or Barbara by giving those two children only life interests, with remainders to their issue. The greater the amount of property passing into the trust, the greater the tax savings would be.

We conclude that the intention of the testator—to deny Thomas the opportunity to dissipate his inheritance, to protect him against creditors, to provide Dolores with a living income, and to save estate taxes—necessarily requires an interpretation which limits paragraph 7 to tangible personal property, and excludes cash, bonds, notes, and trust deeds.

Barbara points out, however, that paragraph 7 of the will, which divides the "personal property" equally among the three children, provides that "my executor shall not deliver any of said personal property until the beneficiaries thereof have delivered to said executor a written agreement as to the method of division. . . ." She then urges the absurdity of detailing specific bequests in a will such as "my 'quail lamp' " and "two of my four folding tables" and then including a relatively lengthy provision relating to "personal property" which turns out to "camouflage" actually only one ring of $100 in value, which is to be delivered only upon receipt of a written agreement as to the method of division.

We believe, however, that paragraph 7 does not frame an attempt by the testator and his attorney to "camouflage" a diamond ring, or, indeed, the ring plus cash, bonds, notes and trust deeds, but, instead, constructs a routine device to protect the executor against conflicting demands from the beneficiaries. The testator knew that his children often quarreled, and that Frank and Barbara had resorted to litigation to settle one dispute between them. The testator stated to his attorney that he was listing and specifically bequeathing the items in paragraphs 3 through 6 in order to create a situation in which his children would not be required to manage matters among themselves.[12] But his attorney would realize, of course, that the testator might not have included all his personal effects in that list, or, indeed, might well acquire additional such property between the date of execution of the will and date of death. In these circumstances, common practice and good draftsmanship compel the attorney to include in the will some provision for unenumerated property, and to require an agreement among the beneficiaries in order to protect the executor from conflicting demands. (See Cal. Will Drafting (Cont.Ed.Bar 1965) § 11.65.)

---

[12]The testator so expressed himself to Dale Cearnal at the time of the drafting of the May 22, 1962 will. As we have noted, Ben Nordman, in drafting the testator's last will, copied paragraph 7 from the May 22, 1962 will without change.

Barbara also contends that Probate Code section 106 mandates that the term "personal property" be given its technical definition.[13] Section 106 reads in part: "Technical words are not necessary to give effect to any species by disposition of a will; but technical words in a will are to be taken in their technical sense, unless the context clearly indicates a contrary intention, or unless it satisfactorily appears that the will was drawn solely by the testator, and that he was unacquainted with such technical sense." The present will was drafted by counsel, so our inquiry centers upon the question of whether the "context" clearly indicates that the testator did not intend to use the term in its technical sense.

■ Semantically, the "context" of a term in a will could refer to the phrase or paragraph in which it appears, to the entire will, or to the will under the circumstances in which it was executed. We prefer the latter, and broadest, definition, for two reasons. First, as we observed in *Estate of Russell* (1968) 69 Cal.2d 200, 209 [70 Cal.Rptr. 561, 444 P.2d 358], " 'Words are used in an endless variety of contexts. Their meaning is not subsequently attached to them by the reader but is formulated by the writer and can only be found by interpretation in the light of all of the circumstances that reveal the sense in which the writer used the words.' " (Quoting concurring opinion of Traynor, J. in *Universal Sales Corp.* v. *California etc. Mfg. Co.* (1942) 20 Cal.2d 751, 776 [128 P.2d 665].) Thus if we were to try to confine the "context" of a term to the phrase or paragraph in which it appears, or even to the will as a whole, our effort would fail, for the intention behind the phrase or paragraph cannot reliably be discerned without examining the will as a whole, and the will cannot reliably be interpreted without considering the circumstances surrounding its execution. (See *Estate of Russell, supra,* 69 Cal.2d at pp. 208-211.)

■ Secondly, as we have said many times, "The paramount rule in the construction of wills, to which all other rules must yield, is that a will is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible." (*Estate of Wilson* (1920) 184 Cal. 63, 66-67 [193 P. 581].)[14] ■ The pre-

---

[13]Barbara cites *Estate of Bourn* (1938) 25 Cal.App.2d 590, 595 [78 P.2d 193], in which the court stated that "where the will is drawn by a lawyer whose experience and competence are beyond question, the presumption that legal terms embodied in the will are used in their legal sense is all but conclusive." (Accord, *Estate of Northcutt* (1940) 16 Cal.2d 683, 689 [107 P.2d 607].) But a will is to be construed according to the intention of the testator (Prob. Code, § 101), not the testator's attorney, and if through misunderstanding the testator and his attorney ascribe different meanings to the language of the will, that meaning intended by the testator must prevail.

[14]See Probate Code section 101; *Estate of Russell* (1968) 69 Cal.2d 200, 205 [70 Cal.Rptr. 561, 444 P.2d 353] and cases there cited.

sumption of a technical meaning established by section 106 is subordinate to the dominant purpose of finding and effecting the testator's intent (*Estate of Kruger* (1942) 55 Cal.App.2d 619, 622 [131 P.2d 619]; see *Estate of Marin* (1945) 69 Cal.App.2d 147, 150 [158 P.2d 412]); it is an aid to be used in ascertaining that intent, not a tool by which the court frustrates the testator's objectives.[15]

■ The testator's intent cannot be garnered from the technical meaning of one phrase, but only from the will as a whole (see *Estate of Williams* (1952) 113 Cal.App.2d 895, 897 [249 P.2d 348]; *Estate of Marin* (1945) 69 Cal.App.2d 147, 150 [158 P.2d 412]), and this will must be examined "in the light of the circumstances surrounding its execution so as to ascertain what the parties meant by the words used." (*Estate of Russell* (1968) 69 Cal.2d 200, 208-209 [70 Cal.Rptr. 561, 444 P.2d 353].) ■ Thus the "context" of a term in a will must also encompass the will as a whole, and the surrounding circumstances and relationships, since otherwise section 106 would serve not to aid in ascertaining the testator's intent but to supplant that intent.

In the present case, the term "personal property" in paragraph 7 of the will cannot be given its technical meaning without frustrating the testator's objectives as manifested both in the language of the will and by the extrinsic evidence. Thus the presumption of section 106 cannot govern here because the crucial words, when taken in "context," as we define that term in this opinion, were not intended to bear such technical meaning.

The order of the superior court is affirmed.

Wright, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

---

[15]In *Estate of Marin* (1945) 69 Cal.App.2d 147 [158 P.2d 412], testator, in a will drafted by counsel, devised to Dr. Robbins her residence and "all the personal property . . . which may be located in . . . said residence." Unknown to counsel, testator kept bonds of $12,000 face value at her residence. Extrinsic evidence established that she intended these bonds to pass not to Dr. Robbins but to the residuary beneficiaries. Since Probate Code section 106 makes no exception for cases in which the draftsman is unaware of the nature or location of the testator's assets, a literal application of that section would cause the bonds to go to Dr. Robbins. The court, however, held that "the meaning of particular phrases is to be subordinated to the dominant purposes of decedent" (69 Cal.App.2d at p. 150), and that, in view of the circumstances surrounding the execution of the will, the bonds passed to the residuary takers.