ESTATE OF JOHN T. HEDRICK, DECEASED, BETSY PHILLIPS, SPECIAL ADMINISTRATOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Hedrick v. Commissioner
Docket No. 23641-90
United States Tax Court
T.C. Memo 1992-414; 1992 Tax Ct. Memo LEXIS 436; 64 T.C.M. (CCH) 249; July 21, 1992, Filed *436 Decision will be entered for respondent. For Petitioner: Michael Wischkaemper. For Respondent: William H. Quealy, Jr.
COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined a deficiency of $ 384,284 in petitioner's Federal estate tax. The issue for decision is whether petitioner is entitled to a deduction under section 2056 for decedent's interest in certain community property that was placed in a trust. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death. FINDINGS OF FACT John T. Hedrick (decedent) died on September 4, 1986. Decedent was survived by his spouse, Cecil Hedrick, who filed the petition in this case. Cecil Hedrick died on May 29, 1991, and Betsy Phillips (Phillips), decedent's cousin, was appointed as special administrator of decedent's estate for the limited purpose of prosecuting this case. Decedent and Cecil Hedrick (the Hedricks) were married for approximately 50 years. They had no children. Over the course of their marriage, the Hedricks acquired a portfolio of largely unimproved real estate that they held for investment. The Council
*437 The Hedricks were members of the Seventh-Day Adventist Church. In 1981, the Hedricks approached John Stevens, Sr. (Stevens), a minister in that church, and expressed to him their personal interest in "religious freedom". The Hedricks decided to create an organization to advance that cause. Approximately 2 years prior to his death, decedent was diagnosed as having a terminal illness. (Due to his terminal illness, the Hedricks expected that decedent would be survived by Cecil Hedrick.) At that time, decedent encouraged Stevens to establish the contemplated organization as soon as possible. Sometime in 1985, Stevens chartered, and became the president of, the Council for Religious Freedom (the council), a nonsectarian charitable organization. The council adopted the Hedricks' beliefs regarding the promotion of religious freedom. The Hedricks expressed to Stevens their desire to leave a substantial portion of their estate to the council. The Hedricks' Estate Plan
Prior to decedent's death, the Hedricks approached David Larkin (Larkin), an attorney with whom decedent had previously consulted regarding the Hedricks' real estate holdings, and requested Larkin's assistance *438 in designing an estate plan. The Hedricks were concerned about the costs associated with probating decedent's estate. Based on several conversations with the Hedricks, Larkin believed that the Hedricks intended to retain control of their property and that ultimately it would be distributed among charitable organizations, including the council. Larkin suggested using an inter vivos trust and explained to the Hedricks the differences between a revocable and an irrevocable trust. Because he was not well versed in the intricacies of estate planning, Larkin furnished to Andrew Sussman (Sussman), an experienced estate planner, a draft of a trust instrument (the draft trust) that Larkin had prepared for another client. Larkin requested that Sussman review the draft and provide Larkin with comments and suggestions. The draft trust created an inter vivos trust and provided that, at any time "during the joint lives of the Trustors, the Trustors jointly as to community property and either Trustor as to his or her separate property" could revoke the trust in whole or in part. The draft trust also provided for the distribution of net income from, and the invasion of the principal of, the *439 trust during the joint lives of the trustors. On the death of the first trustor, the trustee was to divide the trust into three separate trusts, a trust for the survivor, which was to consist of the survivor's separate property and interest in community property, and a marital trust and a residuary trust. Paragraph I.G provided that, at that time, "Except as otherwise expressly provided in this Declaration, * * * the trusts created by this Declaration shall become irrevocable." Sussman sent to Larkin a letter outlining Sussman's comments and suggestions regarding the draft trust (the Sussman letter). Larkin discussed Sussman's recommendations with the Hedricks and explained to them the effect of some of the provisions of the draft trust. Larkin explained that Sussman had suggested that a single trust be used, which would remain "revocable during the Hedricks' lifetime". Larkin also explained that Sussman acknowledged that the Hedricks could use irrevocable trusts if their desire was "to protect themselves from outside pressures" but recommended that the provisions of the draft trust be rewritten "to provide that upon the death of the first spouse to die all the assets stay in *440 the revocable trust. Upon the death of the second spouse then the assets will be given to the charitable beneficiary they select." On January 21, 1986, the Hedricks executed a document that Larkin had drafted, the Declaration of Trust for the Hedrick Family Trust (the trust). In August 1986, the Hedricks executed an amendment to the trust. The declaration and the amendment to the trust (hereinafter referred to collectively as the trust agreement) constituted the sum total of the express terms of the trust as in effect at the date of decedent's death. The Hedricks, as trustors, transferred to the trust certain community property and designated themselves as cotrustees of the trust. The trust agreement contained a provision, paragraph I.E, that was substantially the same as that contained in the draft trust. That provision, with the underscored material representing that which appeared in the draft trust but not in the trust agreement, was as follows: E. Revocation of Trust - At any time and from time to time, during the joint lives of the Trustors, the Trustors jointly as to community property and either Trustor as to his or her separate property may, by serving *441 written notice on the Trustee, revoke the trust created by this Declaration in whole or in part. Any property withdrawn from the Trust Estate by reason of any such revocation shall be delivered by the Trustee to the Trustor or Trustors revoking the Trust. The trust agreement, like the draft trust, also provided that, during the joint lives of the trustors, the "Trustors jointly as to community property" and either as to separate property could alter, amend, or modify the trust. The trust agreement further provided that, during the joint lives of the trustors, the trustee: (1) Was to pay to or apply for the benefit of the Hedricks, at least annually, all of the net income from the trust estate, and (2) had the discretion to pay to or apply for the benefit of the trustors such amounts from the principal of the trust estate as the trustee deemed necessary and advisable for the care, maintenance, support, comfort, and welfare of the trustors. The trust agreement, unlike the draft trust, did not provide for the payment of income of the trust estate to, or for the invasion of the principal of the trust estate for, the surviving trustor. Paragraph IV.A of the trust agreement, entitled *442 "Charitable Distributions", provided that, on the death of the surviving trustor, "the Trust shall become irrevocable." Paragraph IV.A also directed the trustee to pay to certain enumerated charitable organizations, not less frequently than annually, such sums as the trustee determined in his or her discretion. The first organization listed was the council. On January 30, 1986, decedent executed the Last Will and Testament of John T. Hedrick (the will). In the will, decedent gave to Cecil Hedrick certain personal property and gave to the trustees of the trust the residue of his estate to be administered and disposed of in accordance with the terms of the trust agreement. The will also provided that, should that residuary bequest fail, decedent's estate was to be distributed in accordance with the terms of the trust agreement. The Probate Proceedings
On April 20, 1989, the estate filed in the Superior Court of California, County of San Diego, North County Branch (the probate court), a Verified Petition for Instructions Concerning Revocability of Living Trust Instrument (the petition for instructions). The estate filed with the petition for instructions the declarations *443 of Cecil Hedrick, Larkin, and Stevens. On August 8, 1989, in a Memorandum and Order (the order), the probate court found that the trust agreement contained "no express statement of irrevocability, and is therefore fully revocable until the death of the second spouse". That court also found that "the intent of the trustors * * * was to make the trust fully revocable until the death of the second spouse." On April 19, 1990, the estate filed a Verified Petition for Instructions Concerning Revocability of Living Trust Instrument (the second petition for instructions). On August 14, 1990, the probate court issued Instructions to Trustees (the instructions) and reaffirmed its finding in the order that the trust was revocable. That court also found that, "in the event a proper revocation of the Trust occurs during the lifetime of the surviving spouse, the property of the Trust will automatically pass directly to the surviving spouse", because "the power to direct distribution of the Trust property is implicit in the power to revoke the Trust which is possessed by the surviving spouse." Tax Treatment
Cecil Hedrick filed decedent's Federal Estate Tax Return (Form 706). On the *444 Form 706, decedent's gross estate was reported as $ 1,621,509, $ 1,454,229 of which was the value of decedent's interest in the community assets transferred to the trust on January 21, 1986, $ 12,210 of which was decedent's interest in certain income tax refunds reported on Schedule C, and the remainder of which was the value of decedent's interest in other community property and his interest in property held jointly with the right of survivorship with Cecil Hedrick. Decedent claimed a deduction on Schedule M of the Form 706 in the amount of $ 1,618,523, the value of property interests passing to his surviving spouse ($ 1,621,509 less funeral expenses in the amount of $ 2,986). In the notice of deficiency, respondent reduced the amount of the allowable marital deduction from $ 1,618,523 to $ 155,071. Respondent determined that, with respect to the property reported on Schedule C and the property transferred to the trust, "a property interest qualifying for the marital deduction has not passed from the decedent to the surviving spouse." OPINION Section 2056(a) allows a deduction from a decedent's gross estate for the value of property interests passing from a decedent to the surviving *445 spouse, referred to as the marital deduction. Section 2056(b)(1) generally excludes terminable interests from the benefits of the marital deduction. "A 'terminable interest' in property is an interest which will terminate or fail on the lapse of time or on the occurrence or the failure to occur of some contingency." Sec. 20.2056(b)-1(b), Estate Tax Regs. The terminable interest rule of section 2056(b)(1), however, does not apply in certain situations, including where the surviving spouse is entitled to a life estate in property coupled with a general power of appointment. Sec. 2056(b)(5). In this case, we must determine whether decedent's interest in the community property that was transferred to the trust passed to Cecil Hedrick within the meaning of section 2056. Petitioner's position is that the trust was fully revocable during the period following decedent's death and prior to Cecil Hedrick's death (hereinafter sometimes referred to as the survivorship period) and that all of the community property in the trust therefore passed to Cecil Hedrick within the meaning of section 2056. Respondent's position is that decedent did not grant to Cecil Hedrick the power to revoke his *446 interest in the community property transferred to the trust. Respondent contends that, at most, Cecil Hedrick had a life interest in the trust, which interest was a nondeductible terminable interest. Petitioner therefore bears the burden of proving: (1) That Cecil Hedrick had the power to revoke the trust during the survivorship period and (2) that Cecil Hedrick's interest in that property was a deductible interest within the meaning of section 2056. Rule 142(a), Tax Court Rules of Practice and Procedure.
We emphasize here that we must decide only whether Cecil Hedrick had the power during the survivorship period to revoke the trust with respect to decedent's interest in the community property transferred to the trust. Section I.E of the trust agreement provided that "the Trustors jointly as to community property and either Trustor as to his or her separate property" could revoke the trust, in whole or in part, at any time. Petitioner does not contend that, in that provision or in any other provision in the trust agreement, Cecil Hedrick expressly was given the power during the survivorship period to revoke the trust with respect to decedent's interest in the community property *447 transferred to the trust or that there was any "express provision for any distribution" to her during that period. In this case, the law of California governs the nature of Cecil Hedrick's interests and rights in the property transferred to the trust. Morgan v. Commissioner, 309 U.S. 78, 80 (1940). Cal. Prob. Code sec. 15400 (West 1991), provides in part that, "Unless a trust is expressly made irrevocable by the trust instrument, the trust is revocable by the settlor." That portion of the statute replaced without substantive change the first sentence of Cal. Civ. Code sec. 2280 (West 1985), which similarly provided that a trust was revocable by the trustor unless expressly made irrevocable by the trust instrument. See 18 Cal. L. Rev. Comm. Reports 501 (1986). Decedent was the trustor or settlor as to his one-half interest in the community property transferred to the trust, and Cecil Hedrick was the trustor or settlor as to her one-half interest therein. See Schwartz, "California Community Property and Revocable Inter Vivos Trusts: A Word of Caution", 44 Taxes 316, 318 n.11 (1966). Cal. Prob. Code sec. 15400 (West 1991), applies to Cecil Hedrick's right *448 to revoke as to her one-half interest in the community property, and as to any of her separate property, transferred to the trust; it does not, however, deal with her right to revoke the trust with respect to decedent's interest in the community property transferred to the trust, the property as to which decedent was the trustor or settlor within the meaning of that section. See Estate of Boydstun v. Commissioner, T.C. Memo. 1984-312, affd. without published opinion 774 F.2d 1173 (9th Cir. 1985). Moreover, "no implied right of revocation for anyone who is not the trustor exists under the California statute." Id. (citing Hibernia Bank v. Wells Fargo Bank National Association, 66 Cal. App. 3d 399, 136 Cal. Rptr. 60 (Cal. Ct. App. 1977); Wells Fargo Bank American Trust Co. v. Greuner, 226 Cal. App. 2d 454, 38 Cal. Rptr. 132 (1964)). Thus, under the terms of the trust agreement and controlling California law, Cecil Hedrick did not have the power to revoke the trust with respect to decedent's interest in the community property transferred to the trust. Petitioner, however, contends *449 that the will and the trust agreement are ambiguous and that extrinsic evidence is therefore admissible to prove that decedent intended that Cecil Hedrick have the power to revoke the trust. The cardinal rule of construction in California is that wills and trusts are to be interpreted according to the intention of the testator or trustor, as expressed in the documents themselves. In re Estate of Dodge, 6 Cal. 3d 311, 98 Cal. Rptr. 801, 810 (1971); Title Ins. & Trust Co. v. Duffill, 191 Cal. 629, 218 P. 14, 18 (1923). The documents are to be examined "in the light of the circumstances surrounding" their execution to ascertain what was meant by the words used, and extrinsic evidence is admissible to determine whether the seemingly clear language of the instrument is ambiguous. In re Estate of Russell, 69 Cal. 2d 200, 70 Cal. Rptr. 561, 567 (1968). Among the circumstances surrounding the execution of the documents that we may consider are relevant statutes and case law in effect at the time of the execution. In re Heard's Estate, 49 Cal. 2d 514, 319 P.2d 637, 642 (1957). *450 If, in the light of such extrinsic evidence, the provisions of the documents are reasonably susceptible of two or more meanings claimed to have been intended, an uncertainty arises on the face of the documents and extrinsic evidence relevant to prove any of the possible meanings is admissible. In re Estate of Russell, 69 Cal. 2d 200, 70 Cal. Rptr. 561, 569 (1968). Under certain circumstances, the testator's oral declarations and prior testamentary documents can be considered to prove the decedent's intentions. See In re Estate of Dodge, 6 Cal. 3d 311, 98 Cal. Rptr. 801, 808-809 (1971). The rules of construction, however, favor an interpretation of an instrument that gives effect to all of the terms. See Cal. Prob. Code sec. 6160 (West 1991). At trial of this case, we received certain evidence, including the draft trust and the Sussman letter, as well as the testimony of Larkin and Stevens, solely to show the circumstances surrounding the execution of the will and the trust agreement. Respondent argues that the extrinsic evidence is unpersuasive and does not establish that decedent's intent was to give his surviving *451 spouse power to revoke the trust with respect to his share of community property. Before we may consider the extrinsic evidence that petitioner offered to prove that decedent intended that Cecil Hedrick have such a power during the survivorship period and that such property pass to Cecil Hedrick upon decedent's death, petitioner must demonstrate that an ambiguity exists. Petitioner does not point to a particular word or phrase in the trust agreement or will that is ambiguous. Rather, petitioner contends that the trust agreement is ambiguous in that it is not clear whether Cecil Hedrick had the power to revoke the trust during the survivorship period. Petitioner points to four differences in the language of the draft trust and the language of the trust agreement as executed by the Hedricks, which differences, petitioner argues, demonstrate that "there was every intention the trust would be wholly revocable during the lifetime of the surviving spouse." The differences to which petitioner directs our attention are: (1) That paragraph I.G of the draft trust provided that, unless expressly stated otherwise, the trusts created therein became irrevocable on the death of the first trustor, *452 whereas the trust agreement had no comparable paragraph; (2) that Larkin changed the "irrevocable multiple trust arrangement to a revocable one trust arrangement, just as Mr. Sussman had suggested"; (3) that Larkin added to the trust agreement paragraph IV.A, which provided that "the Trust shall become irrevocable" on the death of the survivor; and (4) that Larkin deleted from paragraph I.E of the trust agreement the phrase "during the joint lives of the Trustors". In essence, petitioner contends that certain provisions were added to or deleted from the trust agreement in furtherance of the Hedricks' testamentary declarations. For several reasons, however, we are reluctant to place undue weight on the differences in certain provisions of those two documents. It is apparent to us, based upon our examination of the draft trust and the trust agreement, that Larkin used the former as a point of reference in drafting the latter. Larkin, however, had prepared the draft trust for another of his clients, not specifically for the Hedricks, and he discussed with the Hedricks the effect of certain provisions of the draft trust only after he had received the Sussman letter. Moreover, the *453 draft trust was never executed or otherwise adopted by decedent or Cecil Hedrick. Under these circumstances, it is inappropriate to rely on any differences between the draft trust and the trust agreement to conclude that an ambiguity in the trust agreement exists. Also, we agree with respondent that the trust agreement omitted "many provisions which the Hedricks clearly intended to adopt * * * [and] that one cannot draw any definite inferences from the fact that a provision was included or omitted". In any event, and even considering these differences, we cannot conclude that an ambiguity in the trust agreement exists. Paragraph I.E of the trust agreement provided that the trustor could revoke as to his or her separate property at any time, and that power was not expressly limited to the joint lifetimes of the Hedricks. Cecil Hedrick therefore had the power to revoke the trust with respect to that property during the survivorship period. Upon decedent's death, Cecil Hedrick became the absolute owner of her one-half interest in the community property transferred to the trust. See Cal. Prob. Code sec. 100 (West 1991); Estate of Murphy, 15 Cal. 3d 907, 126 Cal. Rptr. 820, 826 (1976). *454 Thus paragraph I.E and paragraph IV.A, which provided that the trust became irrevocable on the death of the survivor, are unambiguous and not in conflict when construed together. We therefore reject petitioner's assertion that it was "impossible" for the trust to "'become'" irrevocable on the death of the survivor if Cecil Hedrick did not have the power to revoke with respect to decedent's interest in the community property transferred to the trust. Also, contrary to petitioner's understanding, Cecil Hedrick did not automatically acquire, upon decedent's death, ownership of decedent's interest in the community property transferred to the trust. See De Funiak and Vaughn, Principles of Community Property, sec. 206, at 477 (2d ed. 1971). Decedent's interest therein was subject to his testamentary disposition and only in the absence of such a disposition would decedent's interest belong to Cecil Hedrick. See Cal. Prob. Code secs. 100, 6101(b), 6401(a) (West 1991); United States v. Stewart, 270 F.2d 894, 898 (9th Cir. 1959). Because the property was held in trust, however, the disposition of decedent's interest was to be governed by the provisions of the trust *455 agreement. Cal. Prob. Code secs. 104 and 13504 (West 1991). The only dispositive provision in the trust agreement was paragraph IV.A, which provided that the remaining trust estate, of which decedent's interest in the community property transferred to the trust was a part, was to be distributed, upon the death of the survivor, to certain enumerated charities by the trustees. Decedent's will, which was executed at or about the same time that decedent and Cecil Hedrick executed the trust agreement, provided that the residue of his estate was to be disposed of by the trustees of the trust in accordance with the provisions of the trust agreement. In the event of revocation, decedent's interest in the community property transferred to the trust would have passed to the trust, pursuant to decedent's will, and been distributed in accordance with paragraph IV.A of the trust agreement. In our view, those terms of the will and trust agreement demonstrate that it was decedent's intent that Cecil Hedrick not have the power during the survivorship period to revoke the trust with respect to decedent's interest in the community property transferred to the trust and that such property would *456 be held in trust and, upon the death of the survivor, distributed to charities pursuant to paragraph IV.A of the trust agreement. This construction of the trust agreement is consistent with the other provisions of the trust agreement. In particular, we note that the trust agreement did not provide for the distribution of the income from, or for the invasion of, the trust estate during the survivorship period, whereas it did provide for the same during the joint lives of the Hedricks. Thus, Cecil Hedrick's only means of assessing the income or corpus from the trust estate for her support during the survivorship period would have been to revoke the trust in part. It seems implausible that decedent intended that Cecil Hedrick have access to, and effectively more control over, the entire community estate during that period than decedent and Cecil Hedrick had during their joint lives. In light of the above, we conclude that there was no ambiguity with regard to Cecil Hedrick's ability to revoke the trust during the survivorship period and that extrinsic evidence that petitioner offered is therefore inadmissible to prove decedent's intent with respect to his interest in community property *457 transferred to the trust. We are not bound by the determination of the probate court in the uncontested proceedings respecting decedent's intent and Cecil Hedrick's interest in decedent's property. See Commissioner v. Estate of Bosch, 387 U.S. 456, 457 (1967). In sum, petitioner asks that we do that which California law does not permit, namely, construe the trust agreement in a manner that is consistent with petitioner's contention that decedent intended that his interest in the community property pass to Cecil Hedrick upon his death and that it was decedent's intent that the trust "would remain fully revocable by Cecil Hedrick during her lifetime", notwithstanding that the trust agreement was silent in these respects. California law, however, does not permit us to rewrite the instrument to effectuate decedent's intent. Rather, even if resort is had to extrinsic evidence, we must determine decedent's intent from the language used. See De Oliveira v. United States, 767 F.2d 1344, 1349 (9th Cir. 1985), citing Estate of Casey, 128 Cal. App. 3d 867, 198 Cal. Rptr. 170, 172 (1982). That is, we must determine *458 what decedent did do by the manner in which he expressed himself in the instruments, not what he should have done or even that he desired to accomplish a particular objective. Id. Our interpretation of decedent's intent from the language used is that which gives effect to the instrument itself. See In re Estate of Dodge, 6 Cal. 3d 311, 98 Cal. Rptr. 801, 810 (1971). To reflect the foregoing, Decision will be entered for respondent.